UNITED STATES of America, Plaintiff-Appellee,

v.

Wayne COWAN, Defendant-Appellant.

No. 86–3610.

United States Court of Appeals, Fifth Circuit.

May 27, 1987.

Francis King (Court appointed), Asst. Federal Public Defender, New Orleans, La., for defendant-appellant.

Robert Hamilton, Asst. U.S. Atty., John P. Volz, U.S. Atty., Doug Fraizer, Peter G. Strasser, Asst. U.S. Attys., New Orleans, La., for plaintiff-appellee.

* District Judge of the Eastern District of Louisiana, sitting by designation.

Before JOLLY and DAVIS, Circuit Judges and FELDMAN * District Judge.

W. EUGENE DAVIS, Circuit Judge:

Wayne Cowan appeals his conviction for distribution of cocaine and conspiracy to distribute cocaine. Cowan questions the propriety of the district court's ex parte communications with the jury. Because the district court's conduct impermissibly influenced the jury to return a verdict, we reverse Cowan's conviction.

## I.

Wayne Cowan and co-defendant Chris Hebert visited a Shoney's Restaurant to arrange a cocaine sale with Richard Cochrane, an undercover detective. Cowan, Hebert and Cochrane discussed the sale briefly and agreed to meet later that night. Cowan met Cochrane at a different Shoney's at 7:00 p.m., and Cowan then drove with Cochrane to Hebert's apartment. After a brief wait in Hebert's living room, Cochrane entered Hebert's bedroom and purchased a quantity of cocaine. Although Cowan was not in the room when the sale took place, Cowan and Cochrane left Hebert's apartment in the same car.

Cowan was indicted for distribution of cocaine and conspiracy to distribute cocaine. Hebert pleaded guilty and the case against Cowan proceeded to trial. The jury began its deliberations at 11:00 a.m., after a two-day trial. The jury sent out a note at 5:50 p.m. stating "we have reached an agreement on the one count but are unable to agree on the other." The court then delivered a modified *Allen* charge [1] and the jury continued its deliberations. The jury was still undecided by 7:05 p.m. when they sent out a note stating "we are still hung up on the definition of conspiracy. Is there any further feedback you can give us." The court responded with a note asking: "What aspect of the definition of 'conspiracy' is causing a problem?"

At 8:15 p.m., the district judge announced his intention to question each ju-

1. *Allen v. United States,* 164 U.S. 492, 17 S.Ct. 154, 41 L.Ed. 528 (1896).

ror in chambers about the prospect of reaching a verdict. No objections were made. At 8:20 p.m., the judge began meeting with each juror individually, out of the presence of counsel and the defendant. After questioning the jurors on the record, the judge informed counsel and the defendant that there was a reasonable prospect that the jury could reach a verdict. The jury was sent back to the deliberation room at approximately 9:00 p.m., and the jury returned a verdict of guilty on both counts at 9:50 p.m.

The district court sentenced Cowan to a three year prison term for the distribution count and a concurrent three year prison term for the conspiracy count. Cowan was also sentenced to a three year special parole term. This appeal followed.

## II.

The Supreme Court has warned that: [a]ny ex parte meeting or communication between the judge and the foreman of a deliberating jury is pregnant with possibilities for error.... [E]ven an experienced trial judge cannot be certain to avoid all of the pitfalls inherent in such an enterprise.

*United States v. United States Gypsum, Co.,* 438 U.S. 422, 460, 98 S.Ct. 2864, 2885, 57 L.Ed.2d 854 (1978). The district judge in *Gypsum* met privately in chambers with the foreman of a deliberating jury to determine the jury's ability to continue. *Id.,* at 460, 98 S.Ct. at 2885. Defense counsel did not object. *Id.* at 432, 98 S.Ct. at 2870. Near the close of the meeting, the following colloquy took place:

> The Court. I would like to ask the jurors to continue their deliberations and I will take into consideration what you have told me. That is all I can say.
> Mr. Russell. I appreciate it. It is a situation I don't know how to help you get what you are after.
> The Court. Oh. I am not after anything.

Mr. Russell. You are after a verdict one way or the other.
> The Court. Which way it goes doesn't make any difference to me.

*Id.* at 432, 98 S.Ct. at 2871.

The Court in *Gypsum* reversed the conviction for three reasons. First, "the ex parte discussion was inadvertently allowed to drift into what amounted to a supplemental instruction to the foreman relating to the jury's obligation to return a verdict...." *Id.* at 462, 98 S.Ct. at 2886. Second, communicating with the jury through the foreman created an unacceptable risk of innocent misstatement of the judge's directions. *Id.* at 461, 98 S.Ct. at 2885. And third, the exclusion of counsel denied the defendants any chance to correct any mistaken impressions. *Id.* at 462, 98 S.Ct. at 2886. The Court overlooked the failure of counsel to object because defense counsel was led to believe that the judge sought only a report on the jury's ability to continue, not an opportunity to emphasize his desire for a verdict "one way or the other." *Id.* at 461, 98 S.Ct. at 2885.

The district court's ex parte instructions to the jury in this case were in some respects similar to those in *Gypsum;* in other respects the instructions in this case were more coercive than they were in *Gypsum.*

We turn first to the district court's conversation with juror Atkinson. After juror Atkinson explained that he was having problems with the definition of conspiracy, the trial judge responded that "this is the first time, really, any jury has ever had a question about the definition of conspiracy...." When juror Atkinson persisted, the district court responded that "I don't see how there can be any real difference of opinion. They [the jury instructions] are [in] very plain English, which is what they try to do and put it in layman's language and not some technical language that a jury person couldn't understand."[2] Al-

---

2. The full text of the conversation between the district court judge and juror Atkinson was as follows:

The Court: Yes, Mr., have a seat Mr. Atkinson. The only thing I need to know from you is, I know that you are all working hard on

though unintended, the judge's comments could have given this juror the impression that the judge thought the members of this jury were less intelligent than any other jury that had served in his court on a conspiracy case. Juror Atkinson could have reasonably inferred that the judge was irritated that the jury was unable to return a verdict for such a frivolous reason.

The ex parte conversation with juror Sands was similarly objectionable. The district judge expressed his desire for a verdict that night by saying "well, I really hate to keep you here and I was supposed to be home tonight, but it is just one of those things."[3] The pressure to return a verdict was increased by the district judge's expression of incredulity at the jury's ignorance in asking repetitive ques-

this case and if we go ahead and the Court permits you to deliberate some more, do you think there is a reasonable prospect of coming up with a verdict tonight?

Mr. Atkinson: It sort of depends on some of the definitions. I have a problem with the definitions.

The Court: I see. Well, you see, I sent you the standard Fifth Circuit pattern instructions on conspiracy and then you came back and said you had a problem on that and this is the first time, really, any jury has ever had a question about the definition of conspiracy, which is just like I say, in these pattern instructions that are used all over our circuit and—but the only thing I need to know from you, and I don't want you to tell me anything about what the jury is talking about, but just whether in your opinion we should call it a night or do you think if we stay here, if I let you continue your deliberations, that you can come up with a verdict tonight.

Mr. Atkinson: At this point there is a difference in the interpretation in the conspiracy, who can participate, how they can act to participate in a conspiracy.

The Court: Have you read those instructions over?

Mr. Atkinson: Yes, sir.

The Court: I don't see how there can be any real—I don't see how there can be any real difference of opinion. They are [sic] very plain English, which is what they try to do and put it in laymen's language and not some technical language that a jury person couldn't understand. But I would appreciate it if you would read those instructions over again and, because I don't think that you need to tilt the thing one way or the other. Those standard instructions are pretty much right straight down the middle. But anyhow, what is your opinion, should we call it a night or should we continue the deliberations? Do you understand this has to be a unanimous verdict?

Mr. Atkinson: Right.

The Court: And I am asking you to be frank and honest about it.

Mr. Atkinson: Yes.

The Court: Well, you can give me an answer. In other words—

Mr. Atkinson: Well, my feeling is that if somehow the interpretation could be agreed upon of a conspiracy, then it would be a very simple matter.

The Court: Well, the problem is that I have given you what law I am supposed to give you. I have given you the legal definition of conspiracy and it's in about four pages of the instructions and just as I say, there is no reason that I know of where there could be any difference of interpretation and—in other words, you can't give me an answer. All right. You can return to the jury room, to the jury box. Get the next one. Put on the record that Mr. Atkinson sat in his chair and was unable to give an answer after the Court waited for a considerable length of time.

3. The full text of the conversation between the district court judge and juror Sands was as follows:

The Court: Yes, Sir. Have a seat right there. Mr. Sands, have a chair. I don't want you to tell me anything about the deliberation. Don't mention that. What I need to know from you is if the court allows you further time, in your opinion, do you think the jury can go ahead and arrive at a verdict?

Mr. Sands: Fortunately, your honor, since that last message or question was sent to you, or you sent it back to us wanting to know what particular part was bothering us, it looks like we might be achieving a breakthrough. As for myself, your honor, I was ready to give you my opinion at 1:25 this afternoon.

The Court: Well, I really hate to keep you here and I was supposed to be home tonight, but it is just one of those things.

Mr. Sands: Should I tell you the position or composition of the jury?

The Court: No, I really can't let you do that. I just have to let you tell me whether in your opinion, if you go further deliberating that you feel like you can come up with a verdict.

Mr. Sands: As I indicated, it looks like we are beginning to get a breakthrough, a partial clearing of the roadblock.

The Court: The thing I was concerned about there, you see, you asked for the definition of conspiracy—and I cut out the part of the instructions that covered that and sent it in—but then you came back with the same question, basically.

Mr. Sands: I am sorry, Your Honor, but since about 2:30, we have been beating a dead horse, in my opinion.

tions. The district judge told juror Sands as well as juror Koerner that he was puzzled by the repetitive nature of the jury's questions.[4]

We are persuaded that the district court's ex parte communications with the jury in this case are as objectionable, if not more so, than the communications found objectionable in *Gypsum*. First, the district court's discussion was inadvertently allowed to drift into a supplemental instruction regarding the obligation to return a verdict. The district judge's ex parte conversations not only pressured the jurors to decide the case that evening, but also suggested that any juror who did not understand the conspiracy instruction was unintelligent.

Second, the decision in the instant case to meet ex parte with each juror was actually more intrusive than the decision in *Gypsum* to communicate with just the jury foreman. The risks were magnified in the instant case because each juror could have been left with a different impression of the judge's instructions and their discussion of what they were each told had the potential of even greater confusion.

Finally, the exclusion of counsel denied the defendant the opportunity to correct any mistaken impressions the jurors might have taken from the ex parte conversations. The exclusion of counsel denied the defendant the opportunity to object to the district court's supplemental instruction. Fed.R.Crim.P. 32.

The case of *United States v. Gagnon*, 470 U.S. 522, 105 S.Ct. 1482, 84 L.Ed.2d 486 (1985), is distinguishable. *Gagnon* involved a juror who expressed concern during trial because one of the four co-defendants was sketching portraits of the jury. *Id.* at 523, 105 S.Ct. at 1483, 84 L.Ed.

2d at 488. In order to determine whether the juror was prejudiced by the occurrence, the district judge met with the juror in chambers along with the attorney for the defendant who sketched the portraits. *Id.* After both the attorney and the judge questioned the juror, the judge decided that the juror was not prejudiced. *Id.* A transcript was made available to all parties and none objected to the procedure. *Id.* The Court held that the absent co-defendants waived any right under Federal Rule of Criminal Procedure 43 to be present at the meeting. *Id.* at 527, 105 S.Ct. at 1485, 84 L.Ed.2d at 491.

*Gagnon* is distinguishable for three reasons. First, the meeting in *Gagnon* was justified by the need to discretely determine whether the juror was capable of continuing without prejudice to the defendant. Second, defense counsel in *Gagnon* was allowed to attend the meeting and ask questions of the juror. And third, *Gagnon* did not address the instant issue of the defendant's right to object to a supplemental instruction. Fed.R.Crim.P. 32.

We need not reach the issue of whether Cowan waived his right under Federal Rule of Criminal Procedure 43 to be present at the ex parte meetings because the district judge's conduct denied Cowan the opportunity to object to the supplemental instruction under Federal Rule of Criminal Procedure 32. *Gypsum*, 438 U.S. at 462, 98 S.Ct. at 2886. As in *Gypsum*, we overlook the defendant's failure to object because he was led to believe that the district judge sought only to evaluate the prospects for reaching a verdict.[5] *Gypsum*, 438 U.S. at 461, 98 S.Ct. at 2885.

The record suggests no reason for the district court to have embarked on this

---

4. The district court judge also admonished juror Koerner about the puzzling repetitiveness of the jury's questions:

> What puzzles me was I had given the jury the definition of a conspiracy in accordance with the Fifth Circuit standard instructions and then, of course, you came back with another question on the same thing about a conspiracy and then I asked what aspect it was and it's been over an hour, you see.

5. The district judge told counsel in this case that "what I need to do at this point is to take the individual jurors, one at a time, in chambers, and talk to them as to whether there is any prospect of reaching a jury verdict." The district court judge expressed no other purpose for the series of ex parte meetings.

risky procedure of questioning the jurors outside the presence of counsel or the parties. The desired information could have been obtained by a poll in open court, either verbally or in writing, on the question of whether further deliberations would have been fruitful. Allegations of jury misconduct, improper contact with a juror or similar problems may justify ex parte communication between the court and jurors. Absent such compelling circumstances, communication between the court and a deliberating jury should be either in writing or in open court.

### III.

 The government argues that the trial court's error, if any, was harmless. We disagree. After closely reading the transcript of the ex parte communications, we cannot say that the jurors were not intimidated into deciding the case "one way or the other," as was proscribed by *Gypsum.*

The government also seeks to avoid the merits of this case based on the "concurrent sentence doctrine." See *United States v. Adi,* 759 F.2d 404, 409 (5th Cir. 1985). The doctrine recognizes that "the existence of one valid conviction may make unnecessary the review of other convictions when … concurrent sentences have been given." *Id.* In the instant case, the government argues that the jury unequivocally convicted Cowan on the distribution count, leaving only the conspiracy count in question. The court sentenced Cowan to three years imprisonment on each count, with both sentences to run concurrently. The government therefore argues that we should decline to review the questionable conspiracy count because regardless of the outcome, Cowan would still receive the same three year sentence based on the distribution count.

The timing of the jury's verdict forces us to reject this approach. Although the ex parte communications ostensibly focused only on the conspiracy charge, the jury's verdict on both counts was not delivered until after the ex parte communications were completed. The government is therefore only speculating that the jury unequivocally convicted Cowan on the distribution count.

The judgment of the district court is therefore

REVERSED.