**United States Court of Appeals**
**Fifth Circuit**

**F I L E D**

**October 31, 2003**

**Charles R. Fulbruge III**
**Clerk**

IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

No. 02-41176

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

MICHAEL J. PETERS;
JEFFREY L. JACKSON,

Defendants-Appellants.

Appeals from the United States District Court
For the Eastern District of Texas

Before KING, Chief Judge, HIGGINBOTHAM and BARKSDALE, Circuit
Judges.

HIGGINBOTHAM, Circuit Judge:

Michael Peters and Jeffrey Jackson appeal their convictions on

three counts of knowingly operating a defective and damaged

wastewater tank in violation of the Clean Air Act,[1] one count of

making a false writing as to material matters within the

jurisdiction of the Environmental Protection Agency,[2] and one count

_____

[1] 42 U.S.C. § 7413(c)(1) (1995).

[2] 18 U.S.C. § 1001 (2000).

of conspiracy to make the false writing.[3]  They argue that the district court reversibly erred by (1) making coercive statements and giving supplemental instructions to the jury foreperson during an ex parte meeting; (2) allowing the wastewater tank conviction to stand even though the government provided no evidence that they do not qualify under an exception to the regulations; and (3) denying their rights to speedy sentencing and appeal.  Although we find no error in the judge's application of the wastewater tank regulations to the defendants or the speed with which sentencing occurred, we conclude that the judge's ex parte communications with the jury foreperson were reversible error.  We reverse the convictions and remand the case to the district court for a new trial.

I

Huntsman Petrochemical Corporation owns and operates an aromatics and olefins production plant in Port Arthur, Texas.  The Port Arthur plant used benzene to produce ethylene, propylene, and cyclohexalene.  From 1994 to 1996, Appellant Peters was the environmental manager for Huntsman's Jefferson County Operations ("JCO") in southeast Texas.  JCO consisted of four facilities, including the Port Arthur plant, for which Peters oversaw environmental policy and programs.  The managers of each of the four plants managed its daily operations.  Jackson served as a plant manager from early 1995 through mid-1997.

---

[3] 18 U.S.C. § 371 (2000).

The indictment alleged federal statutory violations involving two of the Port Arthur plant's components. First, the plant used a tower to cool water used to cool processes in the Light Olefins Unit. Water pumps through the processes, takes the heat and then circulates through the cooling tower. After being notified by the Texas Natural Resource Conservation Commission ("Commission") that the tower was a potential source for significant airborne benzene emissions, Huntsman discovered that benzene was leaking into the cooling system on a continuous basis. Peters drafted a letter to the Commission that characterized the benzene leak as a "major upset" in normal operations, which would exempt the plant from sanctions under state law. A few weeks later, Peters drafted, and Jackson signed, a Notice of Continuous Release for the benzene releases from the cooling tower that was sent to the EPA and state officials. A continuous release is one that is routine, anticipated, and incidental to normal operations.[4] The government argued at trial that the notice to the EPA that characterized the leak as continuous contradicts Peters' earlier letter to the Commission, which characterized the leak as a "major upset." Further, the government argued that Peters' letter knowingly used benzene emission samples from a different location that had lower level emissions to give a false representation of emissions.

---

[4] 40 C.F.R. § 302.8(b) (2003).

The second alleged violation involved a wastewater tank used to store wastewater prior to treatment. Tank 33756 ("Tank 56") was used as a backup tank to hold benzene-contaminated wastewater. Tank 56 operated by way of an external floating roof, but when the level of wastewater in the tank dropped below a certain level, the floating roof came to rest on its legs instead of the wastewater. Lightning struck the tank in November 1995, causing a fire that damaged the tank's seal. After the fire, Jackson stated that he would continue to use the tank. Huntsman repaired the tank in April 1996. Jackson, Peters, and other Huntsman employees met with state officials to discuss elevated benzene levels in the area of the Port Arthur plant in July 1996. Although Peters and Jackson prepared a chronology before the meeting that showed Tank 56's wastewater level as below the level at which the roof would float on the wastewater, this information was not part of the chronology that Huntsman presented to the state officials.

A federal grand jury indicted Peters and Jackson. The indictment alleged that they attempted to prevent the United States from discovering the unauthorized release of volatile organic compounds. It alleged further that Peters and Jackson violated the Clean Air Act by operating Tank 56 in violation of EPA standards. The case was tried to a jury.

The heart of this appeal focuses on an ex parte meeting between the judge and the jury foreperson that occurred during the jury's three days of deliberations. The jury foreperson sent the

4

judge a note stating, "I'm not going to take insults and I ask to be relieved." In response, the judge informed the attorneys that he wanted to meet privately with the foreperson. The judge told the attorneys that the meeting would be limited to what was bothering the foreperson. The attorneys did not object to the meeting.

During the ex parte meeting, the judge and juror discussed what was bothering the foreperson, but the discussion continued into other areas. The foreperson told the judge that the jury was eleven to one on one count, and "the pressure that was involved on the one person to agree was tremendous." The juror asked the judge what effect the jury's inability to agree on one count would have on the overall verdict. The judge, in addition to answering his question, told the juror, "It is my hope that there would be – everybody hopes the jury will be able to conclude the verdict on all counts." He went on to tell the juror to "reach a unanimous verdict on as many counts as you can without doing violence to anyone's conscience and so on." The foreperson told the judge three times that he was concerned with causing a mistrial, and the judge assured him that the meeting would not do so. The judge went on to tell the foreperson that he would not "declare a mistrial until and unless I [know that], after necessary instructions and so on, it's impossible for the jury to proceed and obtain a unanimous verdict on the issues that are before you." The judge also told the foreperson: "I anticipated that this jury would be out at

5

least two days, probably longer, I mean, yesterday and then today and tomorrow." Finally, the conversation led to inadvertent supplemental instructions. The foreperson asked, "In order to have one . . . overt act to be found guilty of, there may be several parts, and all the parts have to be combined in order to make the one true?" The judge answered, "Yeah," and the foreperson responded, "Okay." Later in the ex parte meeting, when discussing documents involved in the case, the judge instructed the juror "to also remember the testimony about the document."

A court reporter recorded the ex parte meeting, but the judge sealed the transcript until after the trial. The judge told the attorneys that the jury foreperson vented his frustrations. The transcript was unsealed after the trial. It showed (1) the jury's deadlock on one count; (2) the judge's instruction that "everyone hopes the jury will be able to conclude the verdict on all counts"; (3) the foreperson's questions about the effect of the jury's answers on the entire verdict, the possibility of a mistrial because of the meeting, or the meaning of an overt act; and (4) the judge's instructions in response to the foreperson's questions.

The jury found both defendants guilty the day after the meeting. Defendants moved for a new trial based, among other things, on the ex parte meeting. The motions were denied.

II

A

6

Defendants argue that the judge's meeting with the foreperson was reversible error under *United States v. Gypsum Co.*[5] and *United States v. Cowan*.[6]  They argue that the judge's comments and instructions rise to the level of impermissible coercion, and violate their right to be present, to object, and to clarify supplemental instructions when given.

The Supreme Court and this court have warned of the dangers inherent in any ex parte meeting between judge and juror, despite good intentions:

> Any ex parte meeting or communication between the judge and the foreman of a deliberating jury is pregnant with possibilities for error. . . . [E]ven an experienced trial judge cannot be certain to avoid all of the pitfalls inherent in such an enterprise.[7]

The Court in *Gypsum* gave three reasons for the great possibility of error.  First, a judge cannot predict or control the direction a conversation may take, and "[u]nexpected questions or comments can generate unintended and misleading impressions of the judge's subjective personal views which have no place in his instruction to the jury – all the more so when counsel are not present to challenge the statements."[8]  Second, there is a risk that the one juror will return to the jury and provide "innocent misstatements

---

[5] 438 U.S. 422 (1978).

[6] 819 F.2d 89 (5th Cir. 1987).

[7] *Cowan*, 819 F.2d at 91 (*quoting Gypsum*, 438 U.S. at 460).

[8] *Gypsum*, 438 U.S. at 460.

7

of the law and misinterpretations despite the good faith of the participants."[9]  Finally, "the absence of counsel from the meeting and the unavailability of a transcript or full report of the meeting aggravate the problems of having one juror serve as a conduit for communicating instructions to the whole panel."[10]  The supplemental instruction regarding the jury's obligation to return a verdict, coupled with the judge's disallowance of any possible remedy for the situation by excluding the attorneys, led the court to hold that "the Court of Appeals would have been justified in reversing the convictions solely because of the risk that the foreman believed the court was insisting on a dispositive verdict."[11]

In *Gypsum*, the judge informed counsel that he wished to meet with a juror ex parte to discuss solely the jury's health after a long trial.  Counsel made no objection and reluctantly agreed.  The conversation drifted away from its intended topic, moving instead to whether the judge insisted on a verdict.  The Court found the following colloquy to be reversible error:

> THE COURT.  I would like to ask the jurors to continue their deliberations and I will take into consideration what you have told me.  That is all I can say.

---

[9] *Id*. at 461.

[10] *Id*.

[11] *Id*. at 462.

MR. RUSSELL.  I appreciate it.  It is a situation I don't know how to help you get what you're after.

THE COURT.  Oh, I am not after anything.

MR. RUSSELL.  You are after a verdict one way or the other.

THE COURT.  Which way it goes doesn't make any difference to me.[12]

Most of the conversation between the judge and juror concerned the health of the jury after a five-month jury trial, and the state of the jury's deadlock.[13]  Nonetheless, the court found the above colloquy created such a risk of improper influence by the judge that it constituted reversible error.[14]  Neither the judge's comment that he was not after anything, nor the fact that his final statement could be interpreted by some as not insisting on a verdict, could save the jury's verdict.  The risk alone that the judge was insisting on a verdict required reversal.[15]

This circuit followed *Gypsum*'s instruction and reasoning in *Cowan*.  In *Cowan* the jury was deadlocked on the question of conspiracy, and the judge told counsel that he wanted to question each juror ex parte about the prospect of reaching a verdict.[16]

---

[12] *Id*. at 432.

[13] *Id*.

[14] *Id*. at 462.

[15] *Id*.

[16] *Cowan*, 819 F.2d at 90-91.

9

Counsel did not object.[17]  Inadvertently, the ex parte communications drifted into supplemental instructions concerning the jury's obligation to reach a verdict.[18]  A jury member told the judge that the jury could not agree on the definition of conspiracy, and the judge responded, "I don't see how there can be any real difference of opinion.  They [the jury instructions] are [in] very plain English, which is what they try to do and put it in layman's language and not some technical language that a jury person couldn't understand."[19]  The judge also told another juror, "well, I really hate to keep you here and I was supposed to be home tonight, but it is just one of those things."

Relying on *Gypsum*, the *Cowan* court held that these comments impermissibly influenced the jury and required reversal.  First, the comment about the instructions could have made the jury think that the judge viewed them as less intelligent than other juries.[20]  As a result, the juror "could have reasonably inferred that the judge was irritated that the jury was unable to return a verdict for such a frivolous reason."[21]  Second, the comment about hating to keep the jury into the evening could be perceived as pressure to

---

[17] *Id*. at 91.

[18] *Id*. at 91–93.

[19] *Id*. at 91 (alteration in original).

[20] *Id*. 91–92.

[21] *Id*. at 92.

return a verdict.[22]  Third, the situation was aggravated by the fact that the attorneys were excluded from the meetings and were not allowed to correct any mistaken impression given.[23]  The court held that this exclusion constituted a denial of the defendant's right to object to supplemental instructions.[24]

*Cowan* found the error was not harmless because it did not know whether the verdict was a result of the court's improper influence. While the jury convicted the defendant on another count that was not discussed during the ex parte meeting, the second count could not save the verdict because "the jury's verdict on both counts was not delivered until after the ex parte communications were completed."[25]

It is noteworthy that the *Gypsum* and *Cowan* courts reversed despite the lack of an objection by counsel.  The courts forgave the lack of an objection because the ex parte meetings moved beyond the scope of consent given by counsel.  In *Gypsum*, counsel acquiesced to an ex parte meeting limited to receiving "a report on the state of affairs in the jury room and the prospects for a verdict."[26]  Counsel did not agree to an incomplete report of the

---

[22] *Id*. at 92-93.

[23] *Id*. at 93.

[24] *Id*.

[25] *Id*. at 94.

[26] *Gypsum*, 438 U.S. at 461.

meeting, the judge giving supplemental instructions, or the judge's coercion of the jury into reaching a verdict.[27]  The same approach was taken by this circuit in *Cowan*:  "As in *Gypsum*, we overlook the defendant's failure to object because he was led to believe that the district judge sought only to evaluate the prospects for reaching a verdict."[28]

B

*Gypsum* and *Cowan* lead us to find reversible error.  We recognize that this able judge was not bearing down on the foreperson and was not attempting to force a verdict.  But the law controlling this case affords little tolerance for any ex parte meeting between judge and juror during deliberations, and statements that seem innocuous at first glance may - in the law's eye - be improperly influential.  Here, the judge's statements regarding his and everybody's hope for a verdict, his desire for unanimity, his expectations as to how long the jury should take to reach a verdict, and the instructions on the law make the meeting at least as impermissible as those in *Gypsum* and *Cowan*.

First, as in *Gypsum* and *Cowan*, the judge's inadvertent comments regarding his hope for a verdict may have generated the "unintended and misleading impressions of the judge's subjective

---

[27] *Id.*

[28] *Cowan*, 819 F.2d at 93.

12

personal views."[29]  While discussing the foreperson's concern about not reaching a verdict, the judge stated that it was his "hope that there would be – everybody hopes the jury will be able to conclude the verdict on all counts."  He instructed the foreperson to "reach a unanimous verdict on as many counts as you can."  He told the foreperson how long he expected the jury to take in reaching a verdict.  In response to the foreperson's concern that a mistrial may result, the judge assured him that he would only declare a mistrial after he was sure the jury could not reach a unanimous verdict. These statements are not overly or intentionally coercive. However, they are at least as objectionable as the judge's statement in *Gypsum*.  There, the judge said that which way the verdict came out did not matter to him, implying the obligation to return a verdict "one way or the other."  The judge qualified his comments by stating that he was not after anything, but the Court found the meeting to constitute reversible error nonetheless.  The statements here are more explicit and extensive on the judge's personal desire for a verdict.  The judge's comments may have impressed on the jury an obligation to return a verdict, and counsel could not remedy this impression because of their absence. We are left with the possibility of this impression and the inability to correct it, as in *Gypsum* and *Cowan*.

---

[29] *Gypsum*, 438 U.S. at 460.

13

Second, the judge's instructions on the definition of an overt act, the effect of the jury's answer to one count on the overall verdict, and the possibility of a mistrial created the risk that the foreperson would return to the jury and provide "innocent misstatements of the law." Of course, no one knows what was said among the jurors after the ex parte meeting, but we are left with a high risk of the foreperson's misstatements.

Finally, counsel was absent from the meeting, and the transcript was sealed until after the jury delivered its verdict. As noted in *Gypsum* and *Cowan*, these facts aggravate the already high risk of the jury's impression that it must return a verdict and the jury's misinterpretation of the judge's comments. Counsel was unaware of the coercive statements and the supplemental instructions, and therefore was denied the opportunity to remedy the situation. Together these three considerations - the risk of coercion, the incidental supplemental instruction and the absence of counsel - constitute reversible error.

C

We are keenly aware that counsel might sandbag a trial judge by standing down while a judge enters a situation known by all to be "pregnant with possibilities for error." Chief Justice Rehnquist's dissent from *Gypsum*'s approach to the ex parte meeting because the meeting was "consented to by all parties to the case"

14

has great force.[30]  Similarly, the Third Circuit noted the danger of sandbagging in a case where counsel repeatedly encouraged ex parte meetings.[31]  The Chief Justice's view, however, was the dissent, and counsel here did not encourage ex parte meetings. Accordingly, our standard is harmless error.

This case involved a complicated factual history and a technical area of the law.  The jury had difficulty coming to a unanimous verdict.  After reviewing the record, we, like the *Cowan* court, cannot say that the jury was not coerced or intimidated into reaching a unanimous verdict.  We also follow *Cowan* in holding that the jury's possible other verdicts - not discussed in the ex parte meeting - do not provide a basis for affirmance.[32]  The verdict was delivered after the ex parte meeting, and any possibility of a conviction or acquittal on other grounds before that meeting is mere speculation.

---

[30] *Gypsum*, 438 U.S. at 474 (Rehnquist, C.J., concurring in part and dissenting in part).

[31] *United States v. Aimone*, 715 F.2d 822, 829 (3rd Cir. 1983) ("[W]hen defense lawyers, as a matter of trial strategy, urge the judge to conduct off-the-record interviews with a juror in a situation like this, we hold counsel to their obligations to the court.  They may not promote action by a trial judge and then assign that compliance as error.  'Sandbagging' will not be countenanced by this court.").

[32] *Cowan*, 819 F.2d at 94 ("Although the ex parte communications ostensibly focused only on the conspiracy charge, the jury's verdict on both counts was not delivered until after the ex parte communications were completed.  The government is therefore only speculating that the jury unequivocally convicted Cowan on the distribution count.").

15

Defendants also urge that counts 3-5 of their indictment addressing possible Clean Air Act violations fail as a matter of law and require that we dismiss them with prejudice. The argument is that the charged regulations do not apply because defendants chose an alternative means of compliance, and that the government presented no evidence that they did not comply with the alternative, so dismissal with prejudice is required. We disagree.

Defendants were charged with failing to comply with various wastewater tank standards set forth in 40 C.F.R. §§ 60.112b and 60.351. Another regulation, 40 C.F.R. § 61.342(e), provides an alternative means of compliance with benzene waste operations. Although not raised or argued at trial, the argument is that defendants selected this alternative, and the government produced no evidence to show that they did not comply with it.

This alleged error was not raised at trial and we review for plain error. We are persuaded that the alternative on which defendants rely is properly construed as an affirmative defense that the government does not have to plead and prove as an essential element of the offense. It is a "well-established rule of criminal statutory construction that an exception set forth in a distinct clause or provision should be construed as an affirmative defense and not as an essential element of the crime."[33]

---

[33] *United States v. Santos-Riviera*, 183 F.3d 367, 370-71 (5th Cir. 1999) (*citing McKelvey v. United States*, 260 U.S. 353, 357

Here, a provision distinct from the wastewater tank requirements provides an alternative means of compliance.  The government need not negate this exception when charging one with violating the tank standards;  instead, it is the defendants' burden to prove the exception's applicability as an affirmative defense.  There was no error, much less plain error; we therefore remand counts 3-5 of the indictment along with the other counts.

IV

Defendants next contend that delay in sentencing denied their Sixth Amendment right to speedy sentencing and their due process right to a reasonably speedy appeal.  A court considers four factors in determining whether delay in sentencing violated a defendant's rights:  (1) the length of the delay; (2) the reason for the delay; (3) the defendant's assertion of his speedy trial right; and (4) the resulting prejudice to the defendant, if any.[34] Considering these factors in light of the record, we do not believe the defendants' rights were violated.  The delay in sentencing was attributable to the complexity of the issues presented, various post-trial motions, and the resolution of issues regarding the Presentence Report, which defendants fought strongly.  These circumstances show the delay to be reasonable, and no prejudice has been shown that would justify a reversal with prejudice.

(1922)).

[34] *See Barker v. Wingo*, 407 U.S. 514 (1972); *see also United States v. Abou-Kassem*, 78 F.3d 161, 167 (5th Cir. 1996).

V

We REVERSE the defendants' convictions and REMAND for a new trial.