**MALIEK OSTALAZA, Appellant/Defendant**
**v.**
**PEOPLE OF THE VIRGIN ISLANDS, Appellee/Plaintiff**

S. Ct. Crim. No. 2012-0071

Supreme Court of the Virgin Islands

June 26, 2013

535

MARIA T. HODGE, ESQ., Hodge & Francois, St. Thomas, USVI, *Attorney for Appellant.*

JENNIFER L. AUGSPURGER, ESQ., Assistant Attorney General, VI Department of Justice, St. Thomas, USVI, *Attorney for Appellee.*

HODGE, *Chief Justice*; CABRET, *Associate Justice*; and MOORE, *Designated Justice.*[1]

## OPINION OF THE COURT

(June 26, 2013)

HODGE, *Chief Justice*. Maliek Ostalaza appeals from an August 16, 2012 Judgment and Commitment issued by the Superior Court of the Virgin Islands.[2] Ostalaza was adjudged guilty of a number of offenses, including first-degree murder, and was sentenced, *inter alia*, to life

---

[1] Associate Justice Ive Arlington Swan is recused from this matter. The Honorable Thomas K. Moore has been designated to sit in his place pursuant to title 4, section 24(a) of the Virgin Islands Code.

[2] The Judgment was entered on the docket and issued to the parties by the Clerk on August 16, 2012, but was signed on August 14, 2012. For this Court's purposes, the relevant date is

imprisonment without the possibility of parole.[3] The Court rejects Ostalaza's challenges to the sufficiency of the evidence and to the alleged trial errors, and affirms Ostalaza's convictions.

## I. STATEMENT OF RELEVANT FACTS AND PROCEDURAL POSTURE

This case involves the fatal shooting of Kevin James on March 6, 2010. James and his companions — Niki Steele, Kamba Jackson, and Hasheem Smith — spent the evening of March 5, 2010 together, visiting various entertainment venues on St. Thomas. (J.A. 252-53.) The four friends travelled to their destinations in a burgundy Jeep Wrangler, which belonged to Jackson's sister, and which Jackson drove. (J.A. 248, 604.) Eventually, the four individuals arrived the Jaguars nightclub ("Club") in the Long Bay area of St. Thomas. (J.A. 246, 252.) James and Smith went into the Club, while Steele and Jackson "cool[ed] out" in the Wrangler in the Tramway parking lot across the street from the Club. (J.A. 253.)

Steele testified that at some point that morning,[4] the lights came on in the Club and James and Smith exited, returning to the Wrangler. (J.A. 256.) Jackson remained in the driver's seat of the Wrangler, Steele sat in the front passenger seat, Smith sat behind Jackson on the driver's side, and James sat behind Steele. (J.A. 257-58.) They left the Tramway parking lot, went to a gas station store to purchase pizza, and then travelled towards the basketball court in Hospital Ground near James's home. (J.A. 257-58.)

Once at Hospital Ground, they stopped the Wrangler in a well-lit area near the basketball court so that Jackson could relieve himself. (J.A. 259, 263.) While awaiting Jackson's return, Steele heard a vehicle, which she

---

the date of entry of the order or judgment — which constitutes the date on which it was issued — and not the date on which it was signed. *See* V.I.S.CT. R. 5(b)(1) and 5(b)(6).

[3] In an Amended Information filed on May 17, 2012 the People charged Ostalaza with murder in the first degree (Count 8); murder in the second degree (Count 10); assault in the first degree (Count 12); reckless endangerment in the first degree (Count 14); and associated firearm charges (Counts 9, 11, 13). He was adjudged guilty of Counts 8, 12, 14, and the associated firearm charges of Counts 9 and 13. (J.A. 1508-10.) He was found not guilty of second-degree murder and the associated firearms charge; the court vacated the not guilty verdicts because it found them to be inconsistent with its instructions. (J.A. 1509.)

[4] Initially Steele testified that James and Smith exited the club when it closed "after 2:00 [a.m.] probably minutes to 3:00 [a.m.]." (J.A. 255.) She subsequently testified that "Jaguars was finished after four o'clock." (J.A. 258.)

later described as a "Grand Vitara" sport utility vehicle ("SUV"), approaching from the rear and it began to accelerate. (J.A. 260.) As the vehicle approached the Wrangler, it slowed down. (J.A. 261.) Once the vehicle was alongside the Wrangler, Steele saw firearms pointing out of the front and back windows on the driver's side of the vehicle. (J.A. 261.) She yelled out for everyone to "duck," and then heard ten to twelve shots fired at the Wrangler from the other vehicle.[5] (J.A. 262.) James and Steele were hit by the shots; Steele received minor injuries but James suffered a fatal wound to his head and later died at the hospital. (J.A. 279.)

Although Steele was not able to identify the occupants of the Vitara (J.A. 284), Officer Alex Dorsett did. Dorsett, an off-duty Virgin Islands police officer, was working part-time as a security guard for the Club on March 6, 2010. (J.A. 287.) He saw Jamal Morton[6] arrive at the Club in a champagne-colored SUV, the license plate of which read T-D-L 1-8-9. (J.A. 289-90.) Two other individuals were with Morton in the SUV. (J.A. 292.) Dorsett made an in-court identification of Ostalaza and Jevern Phillip[7] as Morton's two companions. (J.A. 292.) Dorsett knew Phillip because Phillip was a regular at the Club, and had a distinct habit of getting a cup of ice at the bar, but leaving the bar to go to his vehicle and fill his cup with liquor before returning to the Club. (J.A. 295-96.) Dorsett remembered Ostalaza from the night of March 6, 2010, but did not previously know him. (J.A. 296.)

Dorsett saw the three men leave the Club around 3:45 a.m., not long before the Club closed. (J.A. 298.) They returned to the SUV, with Phillip in the driver's seat, Morton in the front passenger seat, and with Ostalaza seated behind Phillip. (J.A. 297-99.) Dorsett observed the SUV leave the Club parking lot and drive to the Tramway parking lot across the street, where it remained for a short time. (J.A. 298-99.) After the Club closed, Dorsett saw "three individuals from 'round the field area' " leave the Club and cross the street to get into a maroon Jeep Wrangler that was also parked in the Tramway parking lot. (J.A. 301.) Dorsett described the three men as "[t]wo black rasta males and one was a clean-cut individual, black male also." (J.A. 301.) The Wrangler left the Tramway parking lot with

---

[5] Steele stated that the Vitara was "a light gray, like a lightish kind of color type." (J.A. 263.)

[6] Morton's case was severed from Ostalaza and Phillip's case.

[7] Phillip, Ostalaza's co-defendant, is represented by the Appellate Public Defender and has filed a separate appeal, docketed as S. Ct. Crim. No. 2012-0086.

"[o]ne of the tall rasta guys" driving, and it headed northward. (J.A. 302.) The champagne-colored SUV then "took off directly after it," "[a]bout approximately a minute or two minutes" later.[8] (J.A. 303.) Soon after they departed, Dorsett was talking to a police officer who was stopped on the road near the Club and he heard over the radio transmission, "shots fired in the 'round the field area.' " (J.A. 304.)

After hearing the radio transmission, Dorsett left the Club and went to the police station to give a statement. (J.A. 305.) In a statement transcribed on March 6, 2010, Dorsett identified as one of the suspects Jamal Morton, whom he described as "5'10", slim buil[d]," and wearing a "[b]aseball cap, white polo shirt with stripes, and jean pants." (J.A. 338-39.) He gave a more limited description of the other two individuals, stating that "[o]ne was a dark[-]skinned male, and one was a brown[-]skin[ned] male." (J.A. 340.) He stated that he could recognize the "brown-skin[ned] male" if he saw him again, because he was a regular at the Club on the weekends and a "heavy drinker."[9] (J.A. 340, 348.) At the time of his statement, Dorsett did not indicate that he could name the "dark[-]skinned male," nor was he able to describe the man other than stating that he was about 5'10". (J.A. 341-42, 348.) Dorsett also told the police that he could not identify any of the individuals by name. (J.A. 341, 346.) About two weeks after the incident, Dorsett returned to the police department. He identified Phillip as the driver of the SUV by selecting his photograph from a photo album[10] (J.A. 305), and, using a photo array, identified Ostalaza as the passenger in the SUV who was seated behind the driver. (J.A. 310-14.) At trial, Dorsett identified both Ostalaza and Phillip as having been in the SUV. (J.A. 292.) He also testified that Ostalaza had been at the same Club with Morton the weekend before the

---

[8] When confronted with testimony from the detention hearing, where he had testified that the champagne-colored SUV left "two to three minutes" later, Dorsett testified that "[i]t took off exactly after the Jeep Wrangler took off. I wasn't looking at my watch but it was approximately 'bout two to three minutes . . . . One minute, two minutes, three minutes." (J.A. 323.)

[9] Dorsett acknowledged the following exchange: The police officer taking his statement asked Dorsett, "If you were to see either of those two again can you recognize them," to which Dorsett responded, "Yes, I can[. T]he brown[-]skinned [man,] he is a regular of the club on weekends." (J.A. 351.)

[10] During cross-examination, Dorsett admitted that although he testified during the trial that he had selected Phillip's photograph from an album, he had previously testified during the detention hearing that the photograph was selected from a photo array. (J.A. 317.)

incident, although that information was not included in his statement. (J.A. 326.)

Officer David Petersen also worked as a security guard at the Club on March 6, 2010. At some time after 3:00 a.m., he saw a "champagne, goldish color Vitara" park in the driveway underneath the Club's balcony. (J.A. 906-07.) He then saw Morton, Ostalaza, and another man he could not identify, inside the Club. (J.A. 908-10.) The unidentified man had "light skin," and was wearing a red shirt. (J.A. 911.) Later, Petersen saw Ostalaza and Morton leave the Club together and enter the Vitara. (J.A. 910-11.) The unidentified man sat in the driver's seat of the Vitara, Morton sat in the front passenger seat, and Ostalaza sat in the rear. (J.A. 912.) Petersen saw the Vitara leave the Club parking lot and park in the Tramway parking lot across the street. (J.A. 912.) After the Club closed, Petersen saw three people he knew from the Hospital Ground area leave the Club: a "rasta" male, a female, and another male, and they walked towards the maroon Wrangler Jeep, which was also parked in the Tramway parking lot. (J.A. 915.) The "rasta" man drove the Wrangler, the female sat in the front seat and the other male sat in the back. (J.A. 915.) The Wrangler turned west and, "like seconds after," the champagne-colored Vitara followed. (J.A. 916.) Minutes later, Petersen heard a transmission over the police radio "[s]hots fired 'round the field.' " (J.A. 917.) Petersen then headed to the police station's camera room because he knew there was a security camera recording footage in the area where the shots were reportedly fired. (J.A. 917.) While he was at the police station, the police transcribed a statement from him. (J.A. 939.) Although Petersen identified Ostalaza during his trial testimony, the March 6, 2010 written statement did not identify Ostalaza, and did not describe him other than to state that he was a male. (J.A. 947.) When asked by the police if he could describe the person seated in the back seat of the Vitara, Petersen said he could not. (J.A. 951.)

Ebonee Brooks, a co-owner of the Club, also testified for the People. She indicated that she was working at the front door of the Club from the evening hours of March 5 into the morning hours of March 6. (J.A. 413.) Brooks saw a champagne-colored SUV[11] pull into the parking lot and park where it is "not normal for anyone to park," which caught Brooks's

---

[11] Brooks's co-owner, Reynold Charles, also described the vehicle as a "goldish, champagne[-colored] SUV." (J.A. 437.)

attention. (J.A. 414.) She saw three men get out of the SUV and enter the Club. (J.A. 414.) She testified that one man was a "[t]all, dark male" with a black hat. (J.A. 415.) The second individual was a "tall, light[-]skin[ned]," man that she believed had braids. (J.A. 415.) The last individual she could only describe as being a dark-skinned man who was shorter than the other two men. (J.A. 416.) Once the men left the Club parking lot, they drove the SUV across the street to the Tramway parking lot. (J.A. 416.) Having seen this occur, Brooks called 9-1-1 and provided the dispatcher with a description of the vehicle and its license plate number. (J.A. 417.) The champagne-colored SUV left that parking lot "directly behind" a Jeep Wrangler. (J.A. 417-18, 427.) Several days after the incident, Brooks identified two of the three men — subsequently established to be Phillip and Morton — by looking through photographs at the police station. (J.A. 418.) In a written statement taken by the police, Brooks stated that she could not identify the color of the SUV. (J.A. 423.)

Deputy Chief Maria Colon Jones was the supervisor of the Virgin Islands Police Department's camera room for the St. Thomas/St. John district at the time of the incident. (J.A. 450.) After hearing about the shooting, Jones went to the camera room at about 6:00 a.m. or 7:00 a.m. and reviewed footage from police department cameras placed around St. Thomas. (J.A. 452, 463.) Petersen, who had arrived not long after the shooting and had already been reviewing the footage, pulled up a feed showing a vehicle traveling in the area of the Lionel Roberts Stadium and Maude Proudfoot Drive ("Computer Monitor Video").[12] (J.A. 452.) Jones was unable to extract the video from the hard drive, so she obtained a camcorder and had Sergeant Marsh record a video of the computer monitor as it displayed the feed from the cameras in the area of Hospital Ground ("Camcorder Video"). (J.A. 452, 456.)

From the Computer Monitor Video feed, Jones identified a "goldish, champagne[-]color" four-door Grand Vitara heading in an easterly direction from Maude Proudfoot Drive and the Jarvis school towards the fish market by the Stadium. (J.A. 453.) Petersen testified that, from this video, he was able to identify the vehicle as the Vitara he saw at the Club,

---

[12] To avoid confusion, the Opinion will employ the defined terms, "Computer Monitor Video" and "Camcorder Video." The first term relates to the security camera feed as it was displayed on the computer monitors in the police department's camera room. The second term relates to the video created by the camcorder as it was pointed at the computer monitors.

noting that he could see Morton and the driver, and that they were wearing the same shirts he saw them in at the Club. (J.A. 920.) Petersen looked at a second camera feed and saw the Vitara heading towards the basketball courts "at an abnormal speed." (J.A. 920-21.) After two or three minutes, the Vitara came back in a westerly direction past the Stadium and up Maude Proudfoot Drive towards Mafolie hill, traveling on the wrong side of the road. (J.A. 454, 921.)

Jones indicated that the Computer Monitor Video could be zoomed in or slowed down as she manipulated the main screen. (J.A. 456.) Jones and Petersen both explained that the Computer Monitor Video was "much clearer" than the Camcorder Video, and that they could not preserve a recording of the Computer Monitor Video because the computer system was too old. (J.A. 452, 456, 922, 923.) Because the security camera system at the police department rewrites and rerecords every thirty days, the original Computer Monitor Video has been lost. (J.A. 465.)

The People also called Aisha Abbott to testify as a witness. Abbott, Phillip's step-sister, worked at Dependable Car Rental at the time of the incident. On March 2, 2010, she fraudulently used her sister's name and a customer's credit card to rent a beige-colored Suzuki Vitara with the license plate T-D-L 1-8-9, because she wanted to run some errands. (J.A. 357, 362-63.) She testified that on March 5, 2010, she used the rented Vitara to go to the apartment of Officer Joycelyn Lee-Bobb, her step-mother, to visit her step-sister, Chanice Smith, and Smith's newborn baby. (J.A. 363-65.) Lee-Bobb was Smith and Phillip's mother, and they both lived with her. When Abbott arrived at Lee-Bobb's apartment, Phillip was there. (J.A. 365.) Abbott testified that she fell asleep at the apartment[13] and when she woke up, the Vitara and the keys were missing, and she did not see Phillip in the apartment. (J.A. 368.) Abbott went back to sleep and when she awoke around 6:00 or 7:00 a.m., Phillip was back in the apartment. (J.A. 371.) According to Abbott, Phillip informed her that someone had broken the window of the driver's side passenger door of the Vitara. (J.A. 372.) Abbott then asked Phillip if he had taken the

---

[13] In her written statement, Abbott indicated that she went to sleep around 9:00 p.m., but at trial she testified that she went to sleep around 11:00 p.m. (J.A. 393.) The defendants' witnesses — including Lee-Bobb, Smith, Phillip's girlfriend, and Smith's boyfriend — denied that Abbott was at the home that night and testified that Phillip did not leave the apartment between the evening of March 5 and the morning of March 6, 2010.

Vitara and he admitted that he had taken it to go to town "quick." (J.A. 377.) When she went outside, Abbott saw that the vehicle's driver-side rear window was broken and that the driver's-side rear door was dented. (J.A. 378.) The police obtained a statement from Abbott and seized the vehicle. They found that the window had been shot out, and that there were fragments of bullets inside the Vitara.

After the five-day trial concluded, the jury convicted Ostalaza of murder in the first degree, assault in the first degree, reckless endangerment, and associated firearm charges.[14] Ostalaza filed a Motion for Judgment of Acquittal, or for a New Trial, which the court denied. (J.A. 1488-1503.) Ostalaza filed this timely appeal on July 30, 2012.

## II. DISCUSSION

### A. Jurisdiction and Standard of Review

"The Supreme Court [has] jurisdiction over all appeals arising from final judgments, final decrees or final orders of the Superior Court, or as otherwise provided by law." V.I. CODE ANN. tit. 4, § 32(a). Because the Superior Court's August 16, 2012 Judgment and Commitment is a final judgment, this Court has jurisdiction to consider Ostalaza's appeal. *See, e.g., Browne v. People*, 56 V.I. 207, 216 (V.I. 2012) (stating that in a criminal case, a written judgment embodying the adjudication of guilt and the sentence imposed based on that adjudication constitutes a final judgment for purposes of 4 V.I.C. § 32(a)); *Melendez v. People*, 56 V.I. 244, 251 (V.I. 2012) (same).

The Court reviews the Superior Court's factual findings for clear error and exercises plenary review over the Superior Court's application of the law to those facts. *St. Thomas-St. John Bd. of Elections v. Daniel*, 49 V.I. 322, 329 (V.I. 2007); *see also People v. John*, 52 V.I. 247, 255 (V.I. 2009) (quoting *United States v. Shields*, 458 F.3d 269, 276 (3d Cir. 2006)), *aff'd*, 654 F.3d 412, 55 V.I. 1324 (3d Cir. 2011). Where an appellant fails to object to a Superior Court order or decision, the Court reviews for plain error. V.I.S.CT.R. 4(h); *Phipps v. People*, 54 V.I. 543, 546 (V.I. 2011).

When reviewing a challenge to the sufficiency of the evidence leading to a conviction, the standard "is whether there is substantial evidence,

---

[14] The jury also acquitted Phillip of second-degree murder and the associated firearm charge, but the court vacated these verdicts.

when viewed in the light most favorable to the government, to support the jury's verdict." *Marcelle v. People*, 55 V.I. 536, 541 (V.I. 2011); *Ritter v. People*, 51 V.I. 354, 358, 361 (V.I. 2009). "The appellate court 'must affirm the convictions if a rational trier of fact could have found the defendants guilty beyond a reasonable doubt and the convictions are supported by substantial evidence.'" *Latalladi v. People*, 51 V.I. 137, 145 (V.I. 2009) (quoting *United States v. Gonzalez*, 918 F.2d 1129, 1132 (3d Cir. 1990)). "This evidence 'does not need to be inconsistent with every conclusion save that of guilt' in order to sustain the verdict." *Id.* (quoting *United States v. Allard*, 240 F.2d 840, 841 (3d Cir. 1957) (citing *Holland v. United States*, 348 U.S. 121, 75 S. Ct. 127, 99 L. Ed. 150, 1954-2 C.B. 215 (1954))). "An appellant who seeks to overturn a conviction on insufficiency of the evidence grounds bears 'a very heavy burden.'" *Id.* (quoting *United States v. Losada*, 674 F.2d 167, 173 (2d Cir. 1982)).

## B. Sufficiency of the Evidence

### 1. Impeachment of the People's Witnesses

Ostalaza argues that the People presented insufficient evidence for a reasonable jury to have found him guilty beyond a reasonable doubt. He contends that he was identified by only two witnesses and that both of those witnesses were impeached to a degree that his convictions may not be sustained. (Appellant's Br. 7-11.)

▮ Although the jury's determinations of credibility are given great deference, they are not conclusive, *People v. Williams*, 383 Ill. App. 3d 596, 891 N.E.2d 904, 940, 322 Ill. Dec. 613 (2008),[15] and an appellate court may disregard the jury's reliance on a witness's testimony when that

---

[15] Ostalaza cites *Williams* for the incontrovertible principle that convictions based solely on inherently unbelievable identifications cannot be sustained; however, *Williams* is readily distinguishable from this case. In *Williams*, the court noted that the only eyewitness identification of the defendant came from two minors, and that their testimony "came after substantial prodding through vigorous leading questions, was riddled with internal inconsistencies and self-contradictions, was hesitant, vague, and . . . [was] impeached." *Williams*, 891 N.E.2d at 936. The different circumstances in this case distinguish it from the result in *Williams*. Here, two police officers readily testified regarding their own observations. The sworn testimony of each of them was largely corroborated by the testimony of the other one, as well as by testimony provided by the two Club owners. Furthermore, the few inconsistencies or omissions in their written statements are far from self-contradictory or internally

testimony is "inherently incredible or improbable." *Williams v. Gov't of the V.I.*, 51 V.I. 1053, 1086 (D.V.I. App. Div. 2009) ("Testimony is deemed inherently incredible or improbable where it is 'either so manifestly false that reasonable [people] ought not to believe it, or it must be shown to be false by objects or things as to the existence and meaning of which reasonable [people] should not differ.' " (quoting former version of 29A AM. JUR. 2D *Evidence* § 1375 (2008))).

Ostalaza urges the Court to find Dorsett's testimony incredible. He contends that Dorsett's trial testimony is inconsistent with the statement Dorsett provided to police on March 6, 2010. Dorsett testified during the trial that he was able to identify Ostalaza from a photo array several weeks after the incident. (J.A. 310-14.) However, in the written statement transcribed by the police on the day of the incident, Dorsett was asked whether he could recognize either of the two men who were with Morton, and he responded, "Yes, I can[. T]he brown[-]skinned [man] is a regular of the club on weekends." (J.A. 1446.) Ostalaza emphasizes the fact that Dorsett did not affirmatively state that he could recognize the other man, whom the People would come to identify as Ostalaza. (J.A. 1446.) Dorsett's description of Ostalaza in his statement indicated only that Ostalaza was a dark-skinned man of a height of about 5'10". (J.A. 1446.)

Ostalaza also directs the Court's attention to several other facts to which Dorsett testified at trial that were not included in his statement. At trial, Dorsett testified that Ostalaza had been at the Club the weekend before the incident (J.A. 326), but there is no mention of this in the statement. In addition, Dorsett's statement indicates that he did not see who was driving either of the vehicles (J.A. 1447), but he testified at trial that Phillip drove the Vitara (J.A. 297), and "one of the tall rasta guys" was driving the Wrangler (J.A. 302). Moreover, although asked if he saw in which directions the vehicles travelled once they left the Tramway parking lot, Dorsett told the police that he did not (J.A. 1447), but during his testimony, he stated that the Wrangler headed northward (J.A. 302).

 Ostalaza argues that Dorsett's trial testimony and Dorsett's written statement are inconsistent, and that his "conviction cannot be sustained based on this unreliable and impeached identification testimony." (Appellant's Br. 9.) We disagree. As noted above, we will

---

inconsistent, and certainly not to the degree described in *Williams*. Consequently, the Court considers *Williams* to be inapposite.

refuse to defer to a jury's credibility determinations, and will discredit a witness's testimony, only when the testimony is " 'either so manifestly false that reasonable men ought not to believe it, or it must be shown to be false by objects or things as to the existence and meaning of which reasonable [people] should not differ.' " *Williams*, 51 V.I. at 1086 (quoting former version of 29A AM. JUR. 2D *Evidence* § 1375 (2008)). Here, while the defendants' cross-examination of Dorsett using his March 6, 2010 statement undermined his credibility to some degree, it did not render his testimony entirely unbelievable. Dorsett did not write the statement himself; instead, Dorsett orally answered the officer's questions, and the officer transcribed them into a written statement. The mere fact that Dorsett did not make mention of some observations in his statement that he testified to at trial does not necessarily mean that he was lying. For example, Dorsett explained that the reason he told police that he did not know in which direction the vehicles left the Tramway parking lot was because he understood the police officer's question to be asking about the direction the vehicles headed after they left Dorsett's sight. (J.A. 322.) In addition, while Dorsett signed the statement, declaring that it was "true and correct," neither he nor the police maintained that the statement was a complete recounting of everything he saw that night. (J.A. 1448.) Just because a specific observation is not included in a written statement transcribed by a police officer does not mean that the witness has lied if he later testifies to that observation. We note that "absence of proof is not proof of absence." *Denson v. United States*, 574 F.3d 1318, 1343 (11th Cir. 2009). Courts have recognized that the simple failure to include every detail in a prior statement does not necessarily render it inconsistent with more thorough testimony provided at a later time. *See People v. Hardiway*, 874 P.2d 425, 428 (Colo. Ct. App. 1993) (recognizing that later statements can augment the original statement and observations, and in those cases, "the prior [omission] is often simply too ambiguous to" be considered sufficiently inconsistent for the purposes of impeachment); *see also People v. Jones*, 136 A.D.2d 740, 524 N.Y.S.2d 79, 81 (1988) (although recognizing the state's liberal admission policy regarding inconsistent statements, "it is likewise true that a witness may not be impeached simply by showing that he omitted to state a fact or to state it more fully at a prior time"). Because Dorsett's testimony was not inherently unbelievable, we decline to invade the province of the jury and overrule the jury's credibility determinations. *See Nanton v. People*,

546

52 V.I. 466, 485-86 (V.I. 2009) ("It is inconsequential for purposes of appellate review [] whether [the witness's] testimony reaffirming what he had told the police conflicted with his testimony on cross-examination . . . . '[W]e are not at liberty to substitute our own credibility determinations for those . . . of the jury.' " (quoting *United States v. Dillon*, 532 F.3d 379, 391 n.9 (5th Cir. 2008))).

 Petersen was the only other witness for the People who identified Ostalaza as a participant in the events at issue. Ostalaza claims that Petersen's trial testimony is inconsistent with a March 6, 2010 statement Petersen provided to the police, and so he contends that Petersen "was also thoroughly impeached." (Appellant's Br. 9.) In his police statement, Petersen denied that he could describe the backseat passenger of the Vitara, other than to say that he was male (J.A. 1451), but at trial Petersen was able to identify Ostalaza as the passenger (J.A. 908). However, this "inconsistency" is not as probative of Petersen's credibility as Ostalaza would have us believe. It is conceivable that a person may be unable to articulate a description of someone they have seen, but could still recognize that person when shown a picture of him. *See Duran v. Town of Cicero*, No. 01 C 6858, 2005 U.S. Dist. LEXIS 23291, *18 (N.D. Ill. Oct. 7, 2005), *rev'd in part on other grounds*, *Duran v. Sirgedas*, 240 Fed. Appx. 104 (7th Cir. 2007) (cautioning against treating " 'every failure of memory or variation in a witness's testimony . . . as a sham,' " and refusing to conclude that it is "inherently inconsistent" for a witness to later identify a person that he had previously denied he could recognize (quoting *Bank of Ill. v. Allied Signal Safety Restraint Sys.*, 75 F.3d 1162, 1170 (7th Cir. 1996))); *Davis v. State*, 128 Tex. Crim. 226, 81 S.W.2d 73, 74 (1935) (observing that it is not uncommon for a person to not be able to recognize an individual upon meeting but to subsequently identify that individual with certainty). Just as Dorsett's testimony is not inherently incredible, the jury was likewise entitled to credit Petersen's testimony despite the alleged inconsistencies. *See Nanton*, 52 V.I. at 485-86 (indicating that the inconsistencies went to the weight, rather than the admissibility, of the witness's testimony); *see also Manson v. Brathwaite*, 432 U.S. 98, 116, 97 S. Ct. 2243, 53 L. Ed. 2d 140 (1977) ("We are content to rely on the good sense and judgment of American juries, for evidence with some element of untrustworthiness is customary grist for the jury mill. Juries are not so susceptible that they cannot measure intelligently the weight of identification testimony that has some

questionable feature."). Accordingly, we reject Ostalaza's claim that the officers' testimony was so unreliable and inconsistent as to require a reversal.

### 2. Sufficiency of the Evidence — Intent

 Ostalaza challenges the sufficiency of the evidence supporting his conviction for first-degree murder on the theory that he aided and abetted another in the commission of the crime. In particular, he claims that the People presented no evidence pertaining to Ostalaza's intent.[16] (Appellant's Br. 13.) It is true that the People presented no direct evidence of his intent to murder James. This is not fatal to their case, however, for it is often true that there is no direct evidence of a person's intent. *See Rose v. Clark*, 478 U.S. 570, 581, 106 S. Ct. 3101, 92 L. Ed. 2d 460 (1986) (observing that in "many cases . . . there is no direct evidence of intent"). Instead, the conclusion that someone acted with a particular intent is typically established through circumstantial evidence. *Ibrahim v. Gov't of the V.I.*, 47 V.I. 589, 598 (D.V.I. App. Div. 2005). The jury is entitled to draw certain inferences from the evidence presented before them. *See Nicholas v. People*, 56 V.I. 718, 735 (V.I. 2012) (stating that the jury could infer actual malice from the defendant's shooting of the victim with a firearm in the back of her head).

 In this case, two witnesses testified that Ostalaza was seated in the back of the Vitara just minutes before the shooting. (J.A. 297-99, 912.) Steele, who witnessed the shooting, testified that shots were fired from the back seat of the Vitara. (J.A. 262.) The rear window on the driver's side

---

[16] Ostalaza focuses his argument on whether the People proved that he acted with the intent to help bring about the criminal endeavor. (Appellant's Br. 12-13 (addressing the elements for an aiding and abetting conviction, and citing *Gov't of the V.I. v. Navarro*, 513 F.2d 11, 15, 11 V.I. 542 (3d Cir. 1975)). Because he does not argue that there was insufficient evidence of premeditation, we could decline to address that potential claim. Nonetheless, even if we were to reach the question, we would find that there is sufficient evidence of premeditation. Weighing the evidence in the light most favorable to the People, the testimony showed that the vehicle in which Ostalaza was a passenger specifically followed the Wrangler from the Club to the basketball court, sped up to come alongside the Wrangler, and then slowed down to facilitate the shooting. Furthermore, the use of a deadly weapon against unarmed persons in the absence of any provocation is a fact that can weigh towards a finding of premeditation. Consequently, we would find sufficient evidence of premeditation. *See Brown v. People*, 54 V.I. 496, 506 (V.I. 2011) (stating that "the nature of the weapon used", "lack of provocation" and "the use of a deadly weapon on an unarmed victim" are all factors that weigh towards a finding of premeditation).

was shot out and bullet holes indicated that a weapon was fired from the back seat area of the Vitara. (J.A. 377-78, 482.) It is possible that Ostalaza was never in the Vitara; or that he got out of the Vitara between the Club and the scene of the shooting; or that another person in the Vitara reached into the back seat and, without Ostalaza's knowledge or assent, shot past him at the Wrangler. However, the evidence need not " 'be inconsistent with every conclusion save that of guilt' in order to sustain the verdict." *Latalladi*, 51 V.I. at 145 (quoting *Allard*, 240 F.2d at 841). Here, the jury was entitled to infer that Ostalaza was in the vehicle, remained in the back seat as it travelled to the basketball court, and fired the weapon through the window towards the Wrangler. In the circumstances of this case, firing a weapon through a window at another vehicle is an intentional act that the jury could conclude was done to bring about the death of the occupant or occupants of that vehicle. *See Brown v. People*, 54 V.I. 496, 506 (V.I. 2011) (stating that "the nature of the weapon used," "lack of provocation" and "the use of a deadly weapon on an unarmed victim" are all factors that weigh towards a finding of premeditation). Consequently, although there was no direct evidence of Ostalaza's intent, there was sufficient evidence from which a jury could conclude that Ostalaza participated with the requisite intent in the shooting.

### 3. *Tainted Identifications*

During the trial, Ostalaza objected to the admission of a photo array from which Dorsett identified him, claiming that the People had presented an insufficient foundation to permit its admission. (J.A. 312-13; Appellant's Br. 14.) The trial court admitted the photo array because the People stated that they would call as a witness the officer who showed the array to Dorsett. (J.A. 312-13.) However, Ostalaza complains that this foundation was never provided. Detective Maha Hamdan testified about showing Dorsett four photo albums. However, Dorsett never identified Ostalaza from an album; instead, he identified Ostalaza from a six-photograph array on March 22, 2010. (J.A. 1444.) The People did not provide any foundational evidence about the process by which that identification was made.

 ██ The burden is on a defendant initially to show that an identification was "impermissibly suggestive," as Ostalaza charges here. *United States v. Lawrence*, 349 F.3d 109, 115 (3d Cir. 2003). Of course, such a burden would be difficult to meet without an evidentiary

foundation describing how the identification took place. However, Ostalaza never argued in the trial court that the identification was impermissibly suggestive. He had known about Dorsett's identification of him from a photo array since the November 17, 2011 detention hearing. (J.A. 314-17 (referencing the detention hearing transcript, in which Dorsett mentions his identification of Ostalaza from an array).) However, in the six months transpiring between the detention hearing and the trial, he never moved to have that identification suppressed. Had he filed a motion to that effect, the court could have developed a record regarding the process of the identification, and could have made an informed ruling on whether the identification satisfied the constitutional requirements and therefore should be admitted. *See Richards v. People*, 53 V.I. 379, 387 (V.I. 2010) (applying the two-fold test for determining whether an identification procedure is so suggestive as to violate the defendant's due process rights). Ostalaza failed to meet his burden of showing that the photo array was impermissibly suggestive.[17]

---

[17] Ostalaza also makes a more general objection regarding the lack of foundation for the admission of the array. It is true, as noted, that the court conditionally admitted the array only upon assurances from the People that they would provide testimony from the officer who showed Dorsett the array, which they never did. But a proper foundation requires only that the witness identify that the photograph constitutes a fair and accurate representation of what the witness observed. *See* FED. R. EVID. 901(a) ("To satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is."); *State v. Manocchio*, 497 A.2d 1, 11 (R.I. 1985) (finding a sufficient foundation for the admission of a photo array because "a proper foundation requires testimony that the photograph is a fair and accurate representation of the facts personally observed by the witness"); *State v. Jones*, No. L-05-1232, 2007 Ohio 563, ¶ 55 (Ohio Ct. App. Feb. 9, 2007) (unpublished) (finding sufficient foundation where the witness identified an array as the one from which she selected the defendant, and further identified her own signature underneath the picture of the defendant). The People provided this foundation. While additional evidence would be required to assure the court that the array was not impermissibly suggestive, the burden — as noted in the text above — initially falls on the defendant to make an appropriate motion to suppress so that he can show the court that the procedures surrounding the array were indeed suggestive. And, even if the array lacked a proper foundation — a question we need not reach — any error would be harmless, because there is nothing in this record to show that the procedures were suggestive or that the identification was unreliable. V.I.S.CT.R. 4(i) (noting that the court will not reverse unless the error is harmful, i.e., prejudicial, to the appellant); *see also Richards*, 53 V.I. at 386-87 (noting that a reversal does not automatically following from a suggestive identification procedure — the court would also have to consider whether the identification itself was reliable); *Harker v. Maryland*, 800 F.2d 437, 443 (4th Cir. 1986) (indicating that the exclusion of identification evidence is a "drastic sanction" and therefore should be "limited to identification

## C. Alleged Trial Errors

### 1. *Judge's Ex Parte Communication with the Jury*

Ostalaza argues that he was denied his constitutional right to a fair trial when the judge communicated ex parte with the jury. (Appellant's Br. 16-18.) At issue is a request posed by the jury in a written note to the judge. On May 18, 2012, in the afternoon[18] of the final day of jury deliberations, the judge informed the parties that he had received a note from the jury at 11:10 a.m. (J.A. 1427.) The judge described his communications with the jury as follows:

> They had asked for the statement of Aisha Abbott which was not in evidence. They had also asked for the Police Officer Peterson's second statement which was not in evidence. And they also asked for the computer in order to see the video and hear the [9-1-1] call.

> With respect to the request for the statement, I told the jury, in writing, and sent back a note telling them that the statements were not in evidence. I put the time and the date. And as far as the computer was concerned, we sent the computer in there and IT went in and showed them how to operate it.[19] But I just want to put that on the record so that the record is clear what happened. That all happened at 11:10 this morning. That's a court exhibit.[20]

---

testimony which is manifestly suspect"). Because his failure to object on these grounds below deprived the trial court and this Court of an adequate record from which to analyze his suggestiveness claim, and because the mere failure to establish a foundation is otherwise not prejudicial, we reject Ostalaza's challenge to the admission of the array. *State v. Britton*, 213 Wis. 2d 122, 570 N.W.2d 252 (Wis. Ct. App. 1997) (unpublished table disposition) ("[T]he failure to assert and establish impermissible suggestiveness in the photo array procedure forecloses further analysis.").

[18] The transcript does not reveal at what time the judge convened the court and informed the parties about the note. However, the record does indicate that the parties responded to the judge, "Good afternoon, Your Honor." (J.A. 1427.)

[19] Because it was not raised, the Court need not decide the propriety of permitting court personnel — other than the court marshals — to enter the jury room during deliberations. *Cf.* 5 V.I.C. § 354 ("The officer [in charge of the jury] shall, to the utmost of his ability, keep the jury thus together separate from other persons. He shall not permit any communication to be made to them, nor make any himself unless by the order of the court . . . ."); 5 V.I.C. § 3632 (making section 354 applicable to criminal proceedings).

[20] The parties did not provide a copy of the note in their Joint Appendix, although it was available to them in the trial court file as an exhibit. However, Ostalaza does not argue with

(J.A. 1427-28.) The court then informed the parties that sometime after he communicated this to the jury, he received a second note indicating that the jury had reached a verdict. (J.A. 1428.)

Ostalaza objects to the trial court's response to the request for Officer Petersen's "second statement." He argues that he was prejudiced because "the information given by the Court to the jury was not fully accurate and had the potential to mislead." (Appellant's Br. 17.) According to Ostalaza, the trial court's response implies that there was a statement made by Petersen other than the written statement he gave to police on March 6, 2010, but that, "for some reason, unknown to the jury, [it] was not entered into evidence." (Appellant's Br. 17.) This implication would be misleading, he contends, because there was no evidence presented during the trial that Officer Petersen had ever made a second statement. (Appellant's Br. 18.) Noting that he ·had "fully impeached" Petersen's trial testimony through the use of Petersen's inconsistent March 6, 2010 statement, Ostalaza avers that the suggestion that there might be a second written statement undermined his impeachment efforts. (*Id.*)

 There is no question that the trial court acted improperly when it responded to the jury's note without first sharing it with counsel and Ostalaza. *See United States v. Frazin*, 780 F.2d 1461, 1468-69 (9th Cir. 1986) (stating that the court's ex parte message to a deadlocked jury violated the defendant's constitutional rights); *Bouye v. State*, 699 N.E.2d 620, 628 (Ind. 1998) (noting that when the judge receives a note from the jury, he must inform counsel, and "[w]hen this procedure is not followed, it is an ex parte communication and such communications between the judge and the jury without informing the defendant are forbidden"); 3B CHARLES A. WRIGHT, FEDERAL PRACTICE AND PROCEDURE § 725 (4th ed. 2008) ("A problem of trial practice that arises much more frequently than it should is communication between the court and the jury in the absence of the defendant and — not infrequently — counsel. That such communications are entirely improper is well settled.").[21]

---

the judge's contention in his post-trial opinion that he simply wrote "not in evidence" next to the jury's request for the Abbott and Petersen statements. (J.A. 1492.)

[21] The People also quote FEDERAL PRACTICE AND PROCEDURE; however, they seem unwilling to concede that the trial court's interactions with the jury were error at all. (Appellee's Br. 29 ("The trial court's notice to counsel and parties of this note after it had been provided to the jury would, *if it constituted any error at all*, be harmless error." (emphasis added)).) They

552

■ Ex parte communications between the judge and the jury are forbidden because they risk violating the defendant's constitutional and procedural rights, and endanger the trial process. "The Constitution, the fundamental principles of jury trial, and the Federal Rules of Criminal Procedure guarantee a defendant the right to be present at every stage of trial . . . . Ex parte communications from the judge to the jury violate a defendant's right to due process of law." *Frazin*, 780 F.2d at 1469; *cf. Ellsworth v. Levenhagen*, 248 F.3d 634, 640 (7th Cir. 2001) (indicating that the mere occurrence of an ex parte communication does not violate a defendant's rights, but only does so when it interferes with his ability to defend himself). Such communications are "pregnant with possibilities for error," including that the jury may misunderstand the judge's statements, particularly when counsel are not present to challenge the statements.[22] *United States v. U.S. Gypsum Co.*, 438 U.S. 422, 460-61, 98 S. Ct. 2864, 57 L. Ed. 2d 854 (1978); *see also United States v. Collins*, 665 F.3d 454, 460 (2d Cir. 2012) (explaining further the danger that such communications might unintentionally drift into supplemental instructions, "for which the defendant has a well-established right to be

---

also quote *Bourne v. Curtin*, 666 F.3d 411, 413-14 (6th Cir. 2012), for the proposition that the court's actions were not in error. But *Bourne* at most stands for the principle that such communications should be reviewed under a "harmless error" standard and are not *per se* reversible. *Id.*

[22] Appellate counsel for Ostalaza's co-defendant, Phillip, indicated during oral argument that he believed ex parte communications with the jury are also prohibited by statute. However, during oral argument, counsel was unable to direct the Court to any particular provision of Title 5 containing such a provision. Nonetheless, the Court's own investigation revealed that section 357 of title 5 of the Code appears to prohibit communications between the judge and jury in the manner of ex parte instructions, and counsel confirmed that citation in an April 10, 2013 post-argument letter to the Court. The statute provides:

> After the jury have retired for deliberation, if they desire to be informed on any point of law arising in the case, they may require the officer having them in charge to conduct them into court. Upon their being brought into court the instruction required shall be given by the court in the presence of or after notice to the parties or their attorneys.

5 V.I.C. § 357. It could be argued that this statute only applies to civil cases, as it appears in the subtitle denominated, "Civil Procedure." *Compare* 5 V.I.C. § 357 *with* 5 V.I.C. § 354 (which, unlike § 357, is explicitly made applicable to criminal proceedings by 5 V.I.C. § 3632). Furthermore, there is force to the contention that this section would not apply to all communications, and would only apply instructions on a "point of law." *Id.* However, the Court need not reach this question because, as discussed in the text below, any error in responding to the jurors' message was harmless.

553

present" (citing *Gypsum*, 438 U.S. at 460; *Shields v. United States*, 273 U.S. 583, 588-89, 47 S. Ct. 478, 71 L. Ed. 787 (1927))).

■ However, even when ex parte communications violate a defendant's rights, not every violation will require reversal. *Collins*, 665 F.3d at 460; *Crease v. McKune*, 189 F.3d 1188, 1193 (10th Cir. 1999). Instead, such violations are reviewed for harmless error.[23] *Rushen v. Spain*, 464 U.S. 114, 117-19, 104 S. Ct. 453, 78 L. Ed. 2d 267 (1983).[24] The People must ultimately convince the reviewing court that the error is harmless beyond a reasonable doubt. *See Remmer v. United States*, 347 U.S. 227, 229, 74 S. Ct. 450, 98 L. Ed. 654, 1954-1 C.B. 146 (1954); *Chapman v. California*, 386 U.S. 18, 24, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967).

■ The People argue that the judge's answer to the jury — that the second statement was "not in evidence" — was harmless because it was factually correct. However, Ostalaza does not argue that the statement was factually incorrect; instead, he argues that it was ambiguous, and created the danger that the jurors might believe there was a second statement in existence that was not admissible. We agree with Ostalaza's contention that the fact that the substance of the court's communications was correct does not necessarily preclude error, for even "statements that seem innocuous at first glance may — in the law's eye — be improperly influential." *United States v. Peters*, 349 F.3d 842, 848 (5th Cir. 2003).

■ ■ Although the correctness of an ex parte statement is not sufficient to render such a communication harmless, we nevertheless conclude that the communication here was harmless beyond a reasonable

---

[23] It is true that unobjected errors are typically reviewed under a "plain error" standard. V.I.S.CT. R. 4(h); *Phipps*, 54 V.I. at 546. However, in circumstances such as these, where the communication occurred ex parte, there was no opportunity for Ostalaza to lodge a contemporaneous objection. Indeed, as soon as the trial judge completed his statement to the parties explaining that he had responded to a note from the jury earlier in the morning, he immediately notified the parties that the jury had reached a verdict. (J.A. 1427-28.) Consequently, there was no real opportunity for Ostalaza to make an objection and the Court will apply the harmless error standard of review. *Najawicz v. People*, S. Ct. Crim. No. 2012-0109, 2013 V.I. Supreme LEXIS 12, at *12-14 n.6 (V.I. March 15, 2013) (refusing to find an argument waived because trial counsel "lacked the opportunity to make a considered objection on the record").

[24] The People cited *Rushen* during oral argument for the proposition that the ex parte communication was not error. However, *Rushen* never resolved the question of whether the lower court had erred; instead, it held that the federal court should have deferred to the state court's finding that any such error was harmless. 464 U.S. at 121.

doubt. The court instructed the jury not to consider anything not admitted into evidence (J.A. 1343 ("Anything I have excluded from evidence . . . is not evidence. You should not consider such items.")), and we presume that the jury follows those instructions. *Augustine v. People*, 55 V.I. 678, 686 (V.I. 2011) (noting that " 'we do generally presume that juries follow their instructions' " (quoting *United States v. Liburd*, 607 F.3d 339, 344, 53 V.I. 890 (3d Cir. 2010))). Even if the jury came to believe there was some inadmissible second statement, they could just as easily have speculated that it was helpful to the defense rather than the People. Furthermore, as the trial court recognized, an instruction that there was no second statement would be "misleading and incorrect, since there was neither evidence that there was a second statement nor evidence that there was not a second statement." (J.A. 1501.) Finally, even if the court's communication somewhat lessened the impeachment effect of Petersen's written statement — a conclusion the Court need not draw — the jury could still have relied on Dorsett's identification of Ostalaza. For these reasons, we find the error to be harmless beyond a reasonable doubt. *See Simmonds v. People*, 53 V.I. 549, 561 n.7 (V.I. 2010) (reciting the harmless error standard for violations of constitutional rights); *see also Rushen*, 464 U.S. at 150 (referencing this standard in the context of ex parte communications). In doing so, however, we emphasize that the trial court should take care to avoid these errors in the future. *See Frazin*, 780 F.2d at 1471 (declining to reverse, but noting that "[e]x parte communications with a jury undermine basic principles of due process. Every court has a duty assiduously to avoid them.").

### 2. *Jury Instructions*

#### a. *False in One, False in All*

Ostalaza faults the trial court for not instructing the jury in the manner he requested regarding the credibility of witnesses. The instruction that Ostalaza requested provides:

> If you believe that a witness knowingly testified falsely concerning any important matter, you may distrust the witness's testimony concerning other matters. You may reject all of the testimony or you may accept such parts of the testimony that you believe are true and give it such weight as you think it deserves.

Third Circuit Mod. Crim. Jury Instr. 4.26. The trial court's actual instruction to the jury stated that they "may believe everything a witness says, or part of it, or none of it." (J.A. 1349.)

 Ostalaza raised this objection below; consequently, we review for abuse of discretion. *Gilbert v. People*, 52 V.I. 350, 354 (V.I. 2009). Here, it was within the trial court's discretion to choose an appropriate jury instruction and the court did not abuse that discretion. Its jury instruction correctly stated the law as to witness credibility. *See United States v. Robinson*, 146 Fed. Appx. 255, 260 (10th Cir. 2005) ("Although the factfinder may base its rejection of a witness's testimony on a finding that he or she has testified falsely about another matter, the factfinder is not required to do so."); *State v. Marshall*, 943 So.2d 362, 368 n.3 (La. 2006); *Kinard v. United States*, 416 A.2d 1232, 1236 (D.C. 1980) (refusing to find error because jury was properly instructed that they could believe or disbelieve the witnesses' testimony or give it any weight they chose). Moreover, it was substantially similar to the one requested by Ostalaza. *See United States v. James*, 239 F.3d 120, 125 (2d Cir. 2000) (finding no error where judge "conveyed the practical substance of a *falsus in uno* instruction," though in different words); *United States v. Troutt*, 99 F.3d 1144 (8th Cir. 1996) (unpublished table disposition) (noting that the instruction is not necessary where the court gives a general instruction on witness credibility). We conclude that the trial court did not abuse its discretion.[25]

### b. *Absence of Motive*

Ostalaza also assigns error to the trial court's instruction on motive. During closing arguments, Ostalaza highlighted the lack of any evidence that suggested he had a motive to shoot James. His counsel stated, "Now, what else is missing from the Government's proof against Maliek Ostalaza? . . . . There's no evidence of any motive for him to have done

---

[25] Indeed, some courts have criticized the "false in one, false in all" instruction as being unnecessary and otherwise inappropriate. *United States v. Vitagliano*, 86 Fed. Appx. 470, 474-74 (2d Cir. 2004) (noting that the instruction is "generally disfavored" and of little value); *Parker v. United States*, 801 F.2d 1382, 1385, 255 U.S. App. D.C. 343 (D.C. Cir. 1986) (indicating that the instruction "has been criticized frequently as superfluous and potentially confusing"); *United States v. Taglianetti*, 456 F.2d 1055, 1056 (1st Cir. 1972) ("The *falsus in uno, falsus in omnibus* instruction has long been rejected" and it is sufficient if the court gives a general instruction on witness credibility).

this. . . . And even if the prosecution may tell you they have no legal obligation to prove a motive . . . common sense tells you that people do not go out in the middle of the night to kill somebody unless they have a reason." (J.A. 1308-10.) Immediately following closing arguments, the court read to the jury the instructions he had created with the parties' input. (J.A. 1336-85.)

After giving the instructions, the court excused the jury and inquired of the parties as to whether they had any objections to the instructions it had given. (J.A. 1385-86.) In response to the defendants' closing arguments, the People asked the court for an instruction informing the jury that the People did not have to prove motive in order to obtain a conviction. (J.A. 1396.) Ostalaza objected, stating that if the jury was told that the People did not have to prove motive, without also being told that they could properly consider the lack of motive as relevant to whether the defendant committed the crime, the jury might believe they were prohibited from considering the lack of evidence of motive.[26] (J.A. 1411-13.) Over Ostalaza's objections, the court instructed the jury as follows:

> In this case, the People did not allege a motive on the part of the Defendant. Intent and motive are different concepts and should not be confused. Motive is what prompts a person to act or fail to act and may be attributed to a defendant. Intent refers only to the state of mind with which the act is done or omitted. Proof of motive is not a necessary element of the crimes charged in the Information.

(J.A. 1417-18.)

▮▮▮ It is undisputed that the People need not prove motive in order to obtain a conviction on these charges; however, motive *is* a relevant factor for a jury to consider in a homicide case. *See Pointer v. United States*, 151 U.S. 396, 414, 14 S. Ct. 410, 38 L. Ed. 208 (1894) ("The absence of evidence suggesting a motive for the commission of the crime

---

[26] Ostalaza's counsel further objected that she had already given her closing statement, arguing a lack of motive, and had not been prepared for an instruction explaining only that the People did not have to prove motive. (J.A. 1401.) However, Ostalaza does not indicate how the closing argument would have been different had counsel known of the instruction the court would ultimately give. He does not contend that he would have avoided arguing to the jury that they should consider the lack of evidence of motive. Consequently, he does not show how the provision of a supplemental instruction after closing arguments harmed him.

charged is a circumstance in favor of the accused, to be given such weight as the jury deems proper; but proof of motive is never indispensable to conviction."). The judge, having decided to give an instruction on motive, should have made it clear to the jury that they *could* consider the lack of evidence of motive as a relevant factor in evaluating the defendants' guilt. *See State v. Pinnock*, 220 Conn. 765, 601 A.2d 521, 535 (1992) (finding error in the refusal to give such an instruction); *People v. Hobbs*, 35 Ill. 2d 263, 220 N.E.2d 469, 472 (1966) (observing the utility of the instruction as to an absence of motive evidence "where there is some doubt as to who committed the offense"); *Cook v. State*, 544 N.E.2d 1359, 1364 (Ind. 1989) (noting that an instruction which stated that "the presence or absence of motive is a circumstance which [the jury] may consider," is a "good . . . even-handed and complete" instruction); *State v. Harrison*, 221 Neb. 521, 378 N.W.2d 199, 203 (1985); *State v. Vigil*, 87 N.M. 345, 533 P.2d 578, 581 (1975) ("[W]here all the evidence is circumstantial and there is no proof of motive, it was incumbent on the trial judge to present a properly framed instruction on motive"); *State v. Lancaster*, 167 Ohio St. 391, 149 N.E.2d 157, 162-63 (Ohio 1958) (where evidence of murder is circumstantial, court has duty to instruct jury that they may consider lack of evidence of motive); D.E. Buckner, Annotation, *Necessity That Trial Court Charge Upon Motive in Homicide Case*, 71 A.L.R.2d 1025 (1960) (when the record calls for it, courts should give "a properly framed instruction as to the necessity *and effect* of evidence of motive" (emphasis added)). *But see State v. Jimenez*, 729 A.2d 693, 696-97 (R.I. 1999) (stating that such instruction is not required).

However, although we conclude that the trial court abused its discretion by refusing to qualify the motive instruction as requested by the People, the error was harmless. V.I.S.Ct.R. 4(i) (indicating that the Court will not reverse a conviction on the basis of an error that was merely harmless). While Ostalaza argues that the jury might have believed, as a result of the court's instruction, that they were not permitted to consider the lack of evidence of motive at all, it seems unlikely that the jury would reach this conclusion. *See State v. Bahre*, 456 A.2d 860, 868 (Me. 1983) (defendant is not entitled to a specific instruction on motive; although relevant, the jury would of its own accord weigh the absence or presence of evidence on motive with other facts and circumstances in evidence, and the defendant could argue lack of motive to the jury). The trial court's instruction in this case simply stated that motive is not a necessary

element of the charges. Furthermore, the jury was instructed that they could use their common sense when evaluating the evidence. (J.A. 1339-40 (indicating that the jurors should "give the evidence a reasonable and fair construction in light of [their] common knowledge of the natural tendencies and inclinations of human beings").) The jury was also cautioned that they could not convict the defendant unless they were convinced of his guilt beyond a reasonable doubt. (J.A. 1348.) *See Robinson v. State*, 262 Ind. 463, 317 N.E.2d 850, 853 (1974) (requested instruction was "superfluous" because if the lack of motive raised a reasonable doubt, jury would acquit, having already been instructed that a reasonable doubt must result in an acquittal). Finally, the defendant was free to argue — and did argue — lack of motive to the jury. *See State v. Milke*, 177 Ariz. 118, 865 P.2d 779, 784 (1993) (jury was not misled into believing motive irrelevant since defense argued it to the jury); *State v. Ferguson*, 149 Ariz. 200, 717 P.2d 879, 891 (1986) (finding harmless error because, among other reasons, the defense was not precluded from arguing lack of motive); *State v. Glidden*, 123 N.H. 126, 459 A.2d 1136, 1141 (1983) (same). *But see State v. Hunter*, 136 Ariz. 45, 664 P.2d 195, 200 (1983) (en banc) (finding that a similar instruction was incomplete, prejudicial, and required reversal because it risked misleading the jury "into thinking that motive or lack of motive [was] of no significance at all"). For these reasons, we find that the trial court's error of failing to provide a more complete motive instruction was harmless.

### c. *Eyewitness Identification Instruction*

Ostalaza also objects to the trial court's refusal to give the eyewitness identification instruction that he requested, a claim the Court also reviews for abuse of discretion. *Gilbert*, 52 V.I. at 354. Ostalaza requested that the trial court provide an extensive instruction[27] on eyewitness identification,

---

[27] The instruction requested by Ostalaza provided:

4.15 Eyewitness Identification of the Defendant

One of the issues in this case is whether the defendants are the same persons who committed the offenses. The government, as I have explained, has the burden of proving every element, including identity, beyond a reasonable doubt. Although it is not essential that a witness testifying about the identification himself be free from doubt as to the accuracy or correctness of the identification, you must be satisfied beyond a reasonable doubt based on all the evidence in the case that the defendant is the person who committed the crime(s) charged. If you are not convinced beyond a reasonable doubt that the defendant is the person who committed the crime(s), you must find the defendant not guilty.

adopted from the Third Circuit Model Jury Instructions.[28] Instead, the

---

Identification testimony is, in essence, the expression of an opinion or belief by the witness. The value of the identification depends on the witness's opportunity to observe the person who committed the crime at the time of the offense and the witness's ability to make a reliable identification at a later time based on those observations. You must decide whether you believe the witness's testimony and whether you find beyond a reasonable doubt that the identification is correct. You should evaluate the testimony of a witness who makes an identification in the same manner as you would any other witness. In addition, as you evaluate a witness's identification testimony you should consider the following questions as well as any other questions you believe are important:

First, you should ask whether the witness was able to observe and had an adequate opportunity to observe the person who committed the crime charged. Many factors affect whether a witness has an adequate opportunity to observe the person committing the crime; the factors include the length of time during which the witness observed the person, the distance between the witness and the person, the lighting conditions, how closely the witness was paying attention to the person, whether the witness was under stress while observing the person who committed the crime, whether the witness knew the person from some prior experience, whether the witness and the person committing the crime were of different races, and any other factors you regard as important.

Second, you should ask whether the witness is positive in the identification and whether the witness's testimony remained positive and unqualified after cross-examination. If the witness's identification testimony is positive and unqualified, you should ask whether the witness's certainty is well-founded.

Third, you should ask whether the witness's identification of the defendant after the crime was committed was the product of the witness's own recollection. You may take into account both the strength of the later identification and the circumstances under which that identification was made. You may wish to consider how much time passed between the crime and the witness's later identification of the defendant. You may also consider whether the witness gave a description of the person who committed the crime; how the witness's description of the person who committed the crime compares to the defendant. You may also consider whether the witness was able to identify other participants in the crime. If the identification was made under circumstances that may have influenced the witness, you should examine that identification with great care. Some circumstances which may influence a witness's identification are whether the witness was presented with more than one person or just the defendant; whether the witness made the identification while exposed to the suggestive influences of others; and whether the witness identified the defendant in conditions that created the impression that he was involved in the crime.

Fourth, you should ask whether the witness failed to identify the defendant at any time, identified someone other than the defendant as the person who committed the crime, or changed his or her mind about the identification at any time.

You should receive the identification testimony with caution and scrutinize it with care. If after examining all of the evidence, you have a reasonable doubt as to whether the defendant is the individual who committed the crimes charged, you must find the defendant not guilty.

Third Circuit Model Jury Instructions — Criminal 4.15.

[28] Ostalaza specifically requested Model Jury Instruction 4.15 of the Third Circuit Model

court instructed the jury in a more limited fashion.[29]

 Even if the trial court should have provided the entire model jury instruction, as requested by Ostalaza, any error in using its own instruction was not prejudicial and therefore cannot result in a reversal of Ostalaza's convictions. Although the trial court's instruction used different language, it covered the substance of the requested instruction. The model jury instruction informs the jury that they must be convinced beyond a reasonable doubt that the defendant is the person who committed the crime. The trial court's instruction does this as well. (J.A. 1348.) The trial court's instruction — like the model instruction — indicates that the jury should consider the circumstances under which the identification was made. (J.A. 1347.) The model instruction states that the

---

Criminal Jury Instructions. This model instruction requires certain fields to be filled in by the trial court (e.g., the names of the defendants); because the trial court never gave the requested instruction, the instruction described in note 27, *supra*, is an adaptation of that instruction for the purposes of this case.

[29] The court instructed the jury as follows:

I'll now discuss eyewitness identification. During the trial, an eyewitness or eye-witnesses identified the Defendant as a person at the Jaguar[s] Nightclub. Again, as the judges of the facts, it is up to you to determine how much importance or weight you think that testimony deserves, and how persuasive it is. In assessing how much weight to give to eyewitness testimony that identified the Defendant, you should be guided by a few principles: What were the circumstances in which the witness allegedly identified the Defendant? Was the witness in a good position, with adequate lighting, from which he or she could observe the Defendant's conduct? Was there any other reason the witness might not have had a good opportunity to properly observe the Defendant? Was the witness'[s] testimony weakened by any of the following: Qualifications, hedging, inconsistencies in the rest of his or her testimony, or failure to identify the defendant at another time?

You may also consider evidence of any prior identification of the Defendant by the eyewitness. In this case, allegedly, an eyewitness or eyewitnesses allegedly identified one or both of the Defendants at the Jaguar[s] Nightclub as well as a third individual, Jamal Morton, and allegedly identified one or both of the Defendants and Jamal Morton after participating in a previous identification procedure. You may use this evidence to assist you in determining whether the witness was accurate in identifying the Defendant as the one that he or she allegedly saw on the day of the crime.

You should consider the testimony of the eyewitness or eyewitnesses along with all of the other evidence relevant to the question of who committed the crime. You cannot find the Defendant guilty unless you are satisfied beyond a reasonable doubt by all the evidence, not only that the crime was committed but that it was the Defendant who committed the crime.

(J.A. 1346-48.)

jury should consider whether the witness was certain and unqualified; the trial court's instruction urges consideration of whether the testimony was "weakened by . . . [q]ualifications, hedging." (J.A. 1347.) Where the model instruction charges the jury to weigh whether the identification was the product of the witness's own recollection or, instead, was improperly influenced by others or by the circumstances, the trial court's instruction directs the jury to consider the circumstances surrounding the identification procedure. (J.A. 1348.) Under the model jury instruction, the jury should consider any previous failures to identify the defendant; under the trial court's instruction, the jury should consider any inconsistencies in the identification or any failure to identify the defendant at some other time. (J.A. 1347.)

■ Finally, and most importantly, the model instructions urge the jury to "receive the identification testimony with caution and scrutinize it with care." The trial court did *not* provide a similar instruction. In the circumstances of this case, this failure was error. *See Gov't of the V.I. v. Petersen*, 507 F.2d 898, 901 & n.2, 11 V.I. 488 (3d Cir. 1975) (indicating that in a case involving questionable eyewitness testimony, the jury should receive the caution and care instruction). "Courts have expressed concern about the unreliability of eyewitness identification testimony." *United States v. Thoma*, 713 F.2d 604, 607 (10th Cir. 1983) (collecting cases); *see also United States v. Wilford*, 493 F.2d 730 (3d Cir. 1974) (recognizing the "hazards" of eyewitness testimony and indicating that "a cautionary instruction will help to obviate the danger of erroneous conviction"). For this reason, the Third Circuit Court of Appeals requires the cautionary instruction — i.e., that the identification testimony must be "received with caution and scrutinized with care" — if any one of the four following factors is not satisfied: 1) "the witness had the opportunity to observe the accused"; 2) "the witness is positive in his identification"; 3) "the witness'[s] identification testimony is not weakened by a prior failure to identify or by prior inconsistent identification"; and 4) "after cross-examination, his testimony remains positive and unqualified." *United States v. Barber*, 442 F.2d 517, 528 (3d Cir. 1971). In this case, at the very least the third factor was implicated, as Dorsett and Petersen each initially stated that they could not identify Ostalaza, but Dorsett later selected his photograph from an array and they both identified him at trial.

██ ██ However, although the court's failure to draw the jury's attention to the potential dangers of eyewitness testimony through a "received with caution and scrutinized with care" instruction constituted error, it is not reversible error. We adopt the approach of the Tenth Circuit, as stated in *Thoma*, that "[w]hen a cautionary instruction on the possible infirmities of eyewitness testimony is requested and not given, on appeal we will focus on the facts of each case to determine whether the instruction was required to fairly present the case to the jury." 713 F.2d at 608. Here, the court's instructions drew some attention to the care with which the jury should evaluate the eyewitness testimony, highlighting certain critical factors they should consider. In addition, the defense had adequate opportunity — of which it took certain advantage — to challenge the identification testimony and to argue to the jury its unreliability. *Thoma*, 713 F.2d at 608 (concluding that "the jury's attention was sufficiently focused on the issue of identification and the possibility of misidentification" so that "the failure to give a cautionary instruction . . . was not reversible error"). Furthermore, this is not a case in which there is a single eyewitness; instead, there were two eyewitnesses who saw Ostalaza enter the vehicle, and the testimony they each gave as to other events that night was corroborated by other witnesses and by security camera footage. For these reasons, we decline to find harmful, reversible error based on the trial court's eyewitness identification instructions.

### 3. *Admission of the Camcorder Video*

Ostalaza objects on three grounds to the admission of the Camcorder Video at trial. As discussed above, the Computer Monitor Video was relatively clear, but, because of its age, the police were unable to download or save a copy of the video. Consequently, they created the Camcorder Video, which the parties agree was not as clear as the Computer Monitor Video.

██ ██ First, Ostalaza contends that the video is irrelevant and, consequently, should not have been admitted. Federal Rule of Evidence 402 states that all relevant evidence is generally admissible, subject to any other limitations provided by the Rules. Rule 401 states that evidence is relevant if it "has any tendency to make a [material] fact more or less probable than it would be without the evidence." FED. R. EVID. 401. Here, Ostalaza states that since the video does not depict any of the defendants

— and only shows the subject vehicle driving in the area of the crime scene — it does not make any fact at issue more or less probative. However, the People presented eyewitness testimony linking Ostalaza to the vehicle.[30] That Ostalaza was in or near the Vitara not long before it was used in the shooting makes it more likely that he was involved. Rule 401 does not require the evidence to be dispositive of a fact in issue: the bar is much lower and simply requires that the existence (or non-existence) of such fact it make it more or less likely. *People v. Todmann*, 53 V.I. 431, 451 (V.I. 2010). The People met that burden and the trial court properly ruled that the video evidence was relevant. (J.A. 1512.)

Ostalaza also contends that the video is not a "duplicate" and therefore was inadmissible. Rule 1002 states that, "[a]n original writing, recording, or photograph is required in order to prove its content unless these rules or a federal statute provides otherwise." FED. R. EVID. 1002. A duplicate is admissible to the same extent as an original so long as there is no "genuine question . . . raised about the original's authenticity," and so long as the circumstances do not make it unfair to use the duplicate. FED. R. EVID. 1003. Because the Camcorder Video was less clear than the Computer System Video, Ostalaza argues that it was not a duplicate.

■ However, Ostalaza fails to recognize that when an original is lost or destroyed — through no bad faith on the part of the proponent — the proponent is not required to present either the original or a duplicate. Rule 1004 of the Federal Rules of Evidence makes clear that the original is not required, and other evidence may be used to prove the contents of the original recording, if it is "lost or destroyed, and not by the proponent acting in bad faith." *See Airframe Sys., Inc. v. L-3 Commc'ns Corp.*, 658 F.3d 100, 107 n.9 (1st Cir. 2011) ("The Best Evidence Rule requires that a party seeking to prove the 'content' of a writing must introduce the 'original' or a 'duplicate' of the original, *unless [inter alia]* all originals have been lost or destroyed (absent bad faith by the proponent) . . . . We note that [if one of the prongs of Rule 1004] is satisfied, evidence other than the original may be sufficient . . . ."). Once the original is not available, the law does not establish preferences as to what type of evidence may be used to prove the contents of the original. *See United*

---

[30] They also presented the testimony of Abbott, who stated that Phillip had taken the Vitara in the morning of March 6, 2010. Ostalaza was seen entering the Vitara with Phillip shortly before the incident.

*States v. Carriles*, No. EP-07-CR-0087-KC, 2010 U.S. Dist. LEXIS 123182, at *30-31 (W.D. Tex. Nov. 19, 2010) ("Where all originals are lost or destroyed and no bad faith caused their destruction, *any* form of secondary evidence will suffice . . . [and] challenges to the secondary evidence go to weight, not admissibility." (emphasis added)). Because there are "no degrees of secondary evidence," the Rule "does not recognize a preference for duplicates over other forms of secondary evidence of contents." 31 WRIGHT, FED. PRAC. & PROC. *Evidence* § 8012, at 440. For this reason, evidence that does not qualify as a duplicate under Rule 1003 may still be admitted under Rule 1004, so long as the original has been lost or destroyed not in bad faith. *Id.* at § 8013, p. 446. *See United States v. Gerhart*, 538 F.2d 807, 809 n.2 (8th Cir. 1976) (" 'Once the conditions of Rule 1004 are met the party seeking to prove the contents of the writing . . . may do so by *any kind* of secondary evidence . . . . [T]he opponent may attack the sufficiency of the secondary evidence, [but the attack] goes not to admissibility but to the weight of the evidence' " (quoting 5 J. WEINSTEIN, EVIDENCE P. 1004(01), at 1004-4, 1004-5 (1975))) (emphasis added). Therefore, so long as there was no evidence of bad faith, the People could prove the contents of the original video through any secondary evidence available, including the Camcorder Video and witness testimony, and need not have provided a duplicate.[31] *See United States v. Lanzon*, 639 F.3d 1293, 1302 (11th Cir. 2011) (stating that because there was no showing of bad faith, the trial court did not abuse its discretion in admitting transcripts — rather than originals or duplicates — pursuant to Rule 1004, and that because there was no evidence of bad faith, it was "immaterial whether the transcripts were duplicates within the meaning of the rules"); *Carriles*, 2010 U.S. Dist. LEXIS 123182 at *32-33 ("Given that Rule 1004 and the above[-]cited cases deem admissible 'other evidence' without regard to whether that

---

[31] Ostalaza does not clearly object to the admission of Petersen's testimony describing the contents of the Computer Monitor Video; rather, he constrains himself to challenge the admission of the Camcorder Video itself. It is useful to note, though, that even if he had made such an objection clearly, it would fail. As noted in the text above, testimony may be used to describe the contents of an original video where the original is lost or destroyed not in bad faith. *See United States v. Workinger*, 90 F.3d 1409, 1415 (9th Cir. 1996) (permitting the proponent to admit a transcript of deposition testimony where the original recording of the deposition was lost or destroyed but not in bad faith); *see also State v. Nelsen*, 219 Ore. App. 443, 183 P.3d 219, 223-24 (2008) (indicating that the government may solicit testimony from a police officer who had viewed a surveillance video before it was re-recorded and erased).

secondary evidence constitutes a duplicate, the Court need not address whether the tapes are proper duplicates").

■■ Here, the witnesses from the police department testified that the police station's computer system was old. The technological limitations of the system prevented the police from preserving the original. *See United States v. Balzano*, 687 F.2d 6, 7 (1st Cir. 1982) (per curiam) (sanctioning the admission of a copy of an audio tape pursuant to Rule 1004 where the original was lost not through bad faith, but as a result of technological limitations). There is no evidence that the police were attempting to avoid preserving the evidence to gain some advantage — indeed, Jones summoned another officer to make a copy of the Computer System Video through the best means available — a camcorder. Ostalaza does not argue that the original was destroyed or lost through bad faith — indeed, he does not address the exception in Rule 1004 at all. For these reasons, we conclude that the People were not required to produce the original or a duplicate, and Ostalaza's challenge to the Camcorder Video on the grounds that it is not a "duplicate" of the Computer System Video is meritless. *See, e.g., Lanzon*, 639 F.3d at 1302 (where original not lost or destroyed in bad faith, it is "immaterial" whether the evidence presented at trial constituted a "duplicate"); *Balzano*, 687 F.2d at 7 (indicating that a copy of an audio tape could be used instead of the original pursuant to either Rule 1003 *or* 1004).[32]

---

[32] To the extent that Ostalaza's argument could also be construed as a challenge under the hearsay prohibitions of the Federal Rules of Evidence — i.e., that Petersen was testifying not as to something he personally saw, but as to something in effect told to him by the security video — we would reject such a challenge. Rule 801(c) of the Federal Rules of Evidence defines hearsay as, "a statement that: (1) the declarant does not make while testifying at the current trial or hearing; and (2) a party offers in evidence to prove the truth of the matter asserted in the statement." Rule 801(a) further defines "statement" as "a person's oral assertion, written assertion, or nonverbal conduct, if the person intended it as an assertion." FED. R. EVID. 801(a) (emphasis added). Finally, 801(b) defines "declarant" as "the person who made the statement." FED. R. EVID. 801(b) (emphasis added).

Petersen, as the witness, was testifying as to what he saw on the Computer Monitor Video. As a machine, the security camera system could not be a declarant and could not itself make a statement. *See People v. Mendoza*, No. F051425, 2008 Cal. App. Unpub. LEXIS 1386, at *55 (Cal. App. Ct. Feb. 20, 2008) (unpublished) ("[A]ppellant's *Crawford* argument is based upon a false premise — that the [subsequently erased] surveillance videotapes of the

■ Finally, Ostalaza argues that even if the video is relevant and satisfies the best evidence rule, it should be excluded because the

---

robberies were 'writings' and thus 'statements' within the meaning of the hearsay rule."); *Contini v. Bd. of Educ. of Newark*, 286 N.J. Super. 106, 668 A.2d 434, 445 (N.J. Super. Ct. App. Div. 1995). Consequently, Petersen's testimony would only be hearsay if the persons identified on the video were themselves making a statement. *United States v. Munoz-Mosquera*, 101 F.3d 683 (2d Cir. 1996) (unpublished) ("The visual images on the video tapes at issue were not . . . . 'statements' subject to the hearsay rules."); *People v. Frailley*, Docket No. 272241, 2007 Mich. App. LEXIS 2676, at *2-3 (Mich. Ct. App. Nov. 29, 2007) (unpublished) (rejecting a hearsay challenge to a videotape because any conduct displayed on it was not intended to be assertive, and further rejecting a Confrontation Clause argument on the same grounds); *Pritchard v. State*, 810 N.E.2d 758, 760 (Ind. App. Ct. 2004) (stating that where the witnesses recounted what they saw on the later-missing video tape, "[f]or purposes of the admissibility of their testimony, this is no different than if they had been standing on cell-block E-5 observing the incident"); *People v. Tharpe-Williams*, 286 Ill. App. 3d 605, 676 N.E.2d 717, 720, 221 Ill. Dec. 914 (1997) ("[I]t is axiomatic that an out-of-court statement must be made by a person or writing, not by an object such as a video camera . . . . [Unlike statements made by out-of-court declarants], [o]bjects such as a video camera neither have nor lack credibility or trustworthiness . . . . As such, the underlying basis for excluding hearsay evidence does not apply to 'out-of-court statements' made by a video camera."); *Yost v. Unemployment Comp. Bd. of Review*, 42 A.3d 1158, 1162-64 (Pa. Commw. Ct. 2012).

The video does not contain any verbal or written statements by any of the defendants or anyone else. Consequently, the hearsay rule would apply only if the conduct recorded by the machine constituted a nonverbal assertion. There is nothing here to suggest that the conduct — driving up and down a road — was intended to be an assertion. There is no evidence that the persons driving the vehicle even knew they were being recorded. *Premeau v. Labor & Industry Review Comm'n*, 2001 WI App 58, 241 Wis. 2d 570, 624 N.W.2d 420 (2001) (unpublished) (applying state correlate to Rule 801(a) and finding the conduct displayed on the video to be non-assertive because the person on the video did not know she was being recorded). Their movements and actions do not appear to have been conducted with the intent to make any assertion. *Falin v. Condo. Ass'n of La Mer Estates, Inc.*, No. 11-61903-CIV, 2012 U.S. Dist. LEXIS 181847, at *9 (S.D. Fla. June 15, 2012) (slip op) (finding that a video recording of a woman's general behavior around a dog did not constitute a "statement" under Rule 801(a)); *Harwell v. Commonwealth*, No. 2009-SC-000333-MR, 2011 Ky. Unpub. LEXIS 22, at *24 (Ky. March 24, 2011) (unpublished). *Cf. United States v. Martinez*, 588 F.3d 301, 311 (6th Cir. 2009) (where doctor makes a video for purposes of litigation, court finds assertive conduct). Although this is an issue of first impression for this Court, we would conclude that the hearsay rule is not implicated where a person testifies to nonassertive conduct he sees displayed on a camera, video, or in a photograph. *See State v. Schmidt*, 2012 ND 120, 817 N.W.2d 332, 339 (N.D. 2012) (finding no hearsay where a witness testified as to his recollection of a video, wherein the persons being recorded did not engage in assertive conduct); *Hammock v. State*, 311 Ga. App. 344, 715 S.E.2d 709, 711 (2011) (permitting testimony about conduct viewed on an a subsequently erased videotape, because the value of that testimony relied on the jury's estimation of the witness's truthfulness and competence, and not that of an out-of-court declarant, and so it did not constitute hearsay); *People v. Taylor*, 314 Ill. App. 3d 658, 732 N.E.2d 120, 123-24, 247 Ill. Dec. 404 (2000) (deciding that conduct observed on a missing videotape is not hearsay because the conduct did not constitute a

probative value is outweighed by its potential prejudicial effect. Rule 403 limits the use of otherwise admissible evidence if "its probative value is substantially outweighed by a danger of . . . [*inter alia,*] unfair prejudice, confusing the issues, [or] misleading the jury." FED. R. EVID. 403. First, it is unclear what unfair prejudice the video would cause if, as Ostalaza contends, it does not incriminate him. (J.A. 96 (arguing that the video is irrelevant because it does not link the defendant to the crime).) *See Sherrod v. United States*, No. 08-CV-2013, 2008 U.S. Dist. LEXIS 102727, at *31 (C.D. Ill. Dec. 19, 2008) (unpublished) (determining defendant suffered no undue prejudice in part because he was not identifiable from the admitted photographs); *State v. Giblin*, No. 00CA00033, 2000 Ohio App. LEXIS 5694, at *15 (Ohio Ct. App. Dec. 5, 2000) (unpublished) (finding photographs admissible despite defendant's contention that they did not depict him). Furthermore, after reviewing the video ourselves, we cannot say that the trial court clearly erred when it concluded that the jury would not be misled by the video and "could reach its own conclusions [about] whether the video depicts what the People [] argue that it does." (J.A. 1512.) Finally, the trial court indicated that the video was not so blurry that its probative value would be meaningless. (J.A. 1512.) *See United States v. Larkins*, 83 F.3d 162, 168 (7th Cir. 1996) (affirming the trial court's conclusion that tapes, though not "crystal clear," were sufficiently audible, and the inaudible portions went to the weight the jury would give the tapes, not their admissibility). For these reasons, we conclude that the trial court did not abuse its discretion in admitting the Camcorder Video.

## III. CONCLUSION

Because the People provided sufficient evidence for a reasonable jury to have convicted Ostalaza of the crimes charged, and because none of the alleged trial errors requires reversal, we will affirm the convictions.

---

nonverbal assertion) (citing *Commonwealth v. Lewis*, 424 Pa. Super. 531, 623 A.2d 355 (1993)).